## PEOPLE v SHABAZ

Docket No. 72567. Argued March 6, 1985 (Calendar No. 7).—Decided December 4, 1985.

Askia K. Shabaz was charged with carrying a concealed weapon. The Detroit Recorder's Court, Michael F. Sapala, J., granted the defendant's motion to suppress evidence of the weapon and dismissed the case. The Court of Appeals, D. F. Walsh, P.J., and Beasley and Sullivan, JJ., affirmed in an unpublished opinion per curiam (Docket No. 68266). The people appeal.

In an opinion by Justice Ryan, joined by Justices Levin, Brickley, Cavanagh, and Riley, the Supreme Court held:

Suppression of evidence of the weapon was proper. The seizure of the defendant was unreasonable and, but for the illegal seizure, the weapon would not have been discovered. The circumstances surrounding the seizure of the defendant as they appeared to the police officers at the time of the seizure, considered in their totality, did not provide the requisite particularized suspicion of criminal activity based on objective observation sufficient to outweigh the defendant's privacy interests under the Fourth Amendment.

1. The Fourth Amendment does not provide a guarantee against all searches and seizures, but only against those that are unreasonable. The guarantee applies to all seizures of a person, including seizures involving only brief detention short of traditional arrest. A seizure of a person, to be valid, generally must involve probable cause to arrest. However, a valid investigatory stop may be made by the police with less than probable cause. Such a stop must be reasonable, i.e., it must be justified at its inception and must be reasonably related in

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 5] Am Jur 2d, Searches and Seizures §§ 37 et seq.
See the annotations in the ALR3d/4th Quick Index under Search and Seizure.

[2] Am Jur 2d, Searches and Seizures §§ 1 et seq.
See the annotations in the ALR3d/4th Quick Index under Search and Seizure.

[4] Am Jur 2d, Searches and Seizures § 103.
See the annotations in the ALR3d/4th Quick Index under Search and Seizure.

scope to the circumstances which justified interference by the police with the person's personal security. Justification must be based on an objective manifestation that the person stopped was or was about to be engaged in criminal activity. The totality of the circumstances must be taken into account, and must show that the detaining officer had a particularized and objective basis for the suspicion of criminal activity.

2. The approach of a person by the police in a public place to inquire whether the person is willing to answer questions, the actual questioning of the person, or the introduction in a criminal prosecution of the person's voluntary answers to such questions is not violative of the Fourth Amendment guarantee. Nor would an encounter with a properly identified officer, without more, amount to a seizure requiring some level of objective justification. The person approached, however, need not respond to the officer's questions or may decline to answer the questions, and may not be detained even momentarily without reasonable, objective grounds for doing so.

3. No full search of a person who is merely suspected of criminal activity or of the person's effects may be made without probable cause to arrest. Nor may the police seek to verify suspicions by means that approach the conditions of arrest. Probable cause to arrest requires facts and circumstances within an officer's knowledge that are sufficient to warrant a prudent person or one of reasonable caution to believe that the person suspected has committed, is committing, or is about to commit an offense. The fact that a person may seek to conceal the object of personal business, even in public, does not provide probable cause to arrest. The police may not conclude, merely because an object or a transaction is not openly displayed, that it is necessarily illegal.

4. In this case, the police did not properly identify themselves and approach the defendant for the purpose of questioning him. When he attempted to go on his way, he was pursued and seized by the officers. At the time the officers saw the defendant and began to chase him, they did not have probable cause to arrest him. The facts that the defendant was observed at night in a high-crime neighborhood leaving a building in which the officers previously had made arrests for concealed-weapons violations and narcotics offenses and that, after looking in the direction of the officers' unmarked police vehicle, he attempted to conceal a paper bag under his vest afforded the officers no authority to confront the defendant or to require him to submit to an investigatory stop and interrogation because, on the basis of what they had observed, they had no articulable or particu-

larized grounds to reasonably suspect that the defendant was, had been, or was about to be engaged in criminal activity. Nor did the defendant's flight at the approach of the officers' unmarked police vehicle, by itself, support a reasonable suspicion. While the flight may have heightened the officers' general suspicion, it could not, alone, supply the particularized, reasoned, articulable basis to conclude that criminal activity was afoot so as to justify a temporary seizure.

5. The divestment by the defendant of a paper bag containing a revolver after being pursued by the police was not clearly abandonment. Whether or not abandonment was intended, it would not dissipate the taint flowing from the unreasonable conduct of the police. The pursuit of the defendant by the officers was an effective seizure. A seizure occurs when a reasonable person would believe that he is not free to leave.

Affirmed.

Justice Boyle, joined by Chief Justice Williams, dissenting, stated that in this case there was no intrusion of protected interests sufficient to amount to a stop. While the reasonable belief of a person actually stopped by the police is relevant to whether a seizure has occurred, the threshold issue, whether a stop occurred, is one of law. On the record in this case, the pursuit of the defendant by the officers as a matter of law, was not a detention for investigation. Not even a forcible stop occurred before the defendant discarded the bag. Even if the pursuit was a stop, it is clear on the basis of the totality of the circumstances that the seizure was justified by a reasonable suspicion, founded on objective facts, that the defendant was involved in criminal activity. Because any seizure of the defendant was based on reasonable suspicion, the seizure of the bag was justified.

### Opinion of the Court

1. Searches and Seizures — Arrest — Probable Cause.

No full search of a person who is merely suspected of criminal activity or of the person's effects may be made without probable cause to arrest; nor may the police seek to verify suspicions by means that approach the conditions of arrest; the fact that a person may seek to conceal the object of personal business, even in public, does not provide probable cause to arrest, and the police may not conclude, merely because an object or a transaction is not openly displayed, that it is necessarily illegal (US Const, Am IV).

2. Searches and Seizures — Effective Seizure.

A seizure occurs when a reasonable person would believe that he

is not free to leave, and the pursuit of a person by police officers who did not properly identify themselves and who approached the person in an unmarked police car was an effective seizure (US Const, Am IV).

3. Searches and Seizures — Arrest — Probable Cause.

Observation by police officers of a person at night, in a high-crime neighborhood, leaving a building in which the officers previously had made arrests for concealed-weapons violations and narcotics offenses, an attempt by the person to conceal a paper bag he was carrying, and his flight at the approach of the officers' unmarked police vehicle did not supply a particularized, reasoned, articulable basis to conclude that the person was, had been, or was about to be engaged in criminal activity so as to justify a temporary seizure of the person (US Const, Am IV).

Dissenting Opinion by Boyle, J.

4. Searches and Seizures — Detention for Investigation.

*While the reasonable belief of a person actually stopped by the police is relevant to whether a seizure has occurred, the threshold issue whether a stop occurred is one of law; a pursuit by police running after a person in an attempt to stop the person to ascertain whether a weapon was being concealed was not, as a matter of law, a detention for investigation (US Const, Am IV).*

5. Searches and Seizures — Reasonable Suspicion.

*Any seizure of a person resulting from a pursuit by experienced police officers after observing the person in a high-crime area, late at night, leaving a building in which the officers previously had made narcotics and concealed-weapons arrests, while attempting to conceal a paper bag, and after the person began to run upon seeing the officers was based on reasonable suspicion and justified the seizure of the bag (US Const, Am IV).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Andrea L. Solak,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence* for the defendant.

RYAN, J. Defendant, Askia Khalil Shabaz,[1] was arrested for carrying a concealed weapon, a .357 caliber Smith and Wesson revolver, in violation of MCL 750.227; MSA 28.424. Following a preliminary examination held in the 36th District Court on July 22, 1982, he was bound over to the Recorder's Court for the City of Detroit for trial as charged. In October, 1982, an evidentiary hearing was held in the Recorder's Court upon the defendant's motion to quash the information or, in the alternative, to suppress the revolver as evidence.[2] At the conclusion of the hearing, the court granted the motion to suppress the evidence, and dismissed the case. Upon the prosecutor's appeal, the Court of Appeals affirmed the trial court's ruling, in an unpublished opinion per curiam, finding that the trial court's action was not clearly erroneous. We granted leave to appeal, 418 Mich 950 (1984).

I

The facts available to us are taken from the preliminary examination and the evidentiary hearing, from the testimony of Officer Kenneth Surma, who was the only witness at both hearings.

On July 22, 1982, at approximately 9:00 P.M., Detroit Police Officers Surma, Scotsky, and Hayes were on patrol in an unmarked police vehicle in the area of Clairmount and Woodward Avenues in the City of Detroit. The officers were in plain clothes, and Officer Scotsky was driving.

The vehicle was proceeding westbound on Clair-

---

[1] Defendant's last name has been spelled "Shabaz" for most of the proceedings heretofore. However, defendant, in filling out the affidavit of indigency supporting petition for counsel for appellate review, spelled his name "Shabazz."

[2] The hearing judge characterized the proceeding as "an Evidentiary Hearing to determine the legality of the seizure and/or search of an item of evidence."

mount from Woodward when Officer Surma observed defendant leaving a building at 60 Clairmount, which is on the north side of Clairmount and which comprises approximately thirty apartments.

Surma observed defendant carrying a small brown paper bag, and walking east on Clairmount toward Woodward Avenue. At the time he observed defendant leaving the building, Surma was in the police vehicle approximately fifty feet from the defendant, and the police car was moving toward defendant. Defendant looked in Surma's direction and began "stuffing a paper bag like under his vest," or "in his pants." The driver, Officer Scotsky, slowed the vehicle, and the defendant and the scout car passed each other. When the officers' vehicle had nearly come to a complete stop, defendant "took off running." Surma testified: "We started slowing down to take a better look at what he was doing. As we were coming to a stop, he immediately started to run."

Officer Scotsky put the car in reverse and backed the vehicle to the corner of Woodward and Clairmount. When the car was approximately ten to fifteen feet from defendant, Surma got out of the car and chased the defendant south on Woodward while Officer Hayes "backed up" Surma. Surma chased defendant a distance of about three storefronts, and observed defendant enter a doorway at 9037 Woodward. During the chase, Surma did not observe anything in defendant's hands. By the time Surma reached the doorway the defendant had entered, defendant was coming out. Surma grabbed defendant and, as the defendant tried to push away, Surma "tossed him towards Officer Hayes," and Hayes subdued the defendant. While chasing the defendant, Hayes had pulled his service revolver and, when defendant and Hayes

collided, the firearm discharged, although no one was struck. Surma then went into the vestibule of the building and retrieved a closed, brown paper bag. Surma did not know what was in the bag until after he retrieved it. The bag contained a "Smith & Wesson, four inch blue steel revolver, .357."

Officer Surma confiscated the weapon, unloaded it, and asked the defendant if he had a permit. After receiving a negative reply from the defendant, Surma placed defendant under arrest for unlawfully carrying a concealed weapon. During the chase, none of the officers had identified themselves as police officers or given any order or command to the defendant.

Surma testified, at the preliminary examination, that he thought the defendant was "hiding something," and that "I believed it to be either weapon [sic] or narcotics," and that was the reason Officer Scotsky stopped the car. At the time Surma observed the defendant leave the apartment building on Clairmount, Surma did not have "any reports of a felony having been committed with the description of Mr. Shabaz," and Surma could not recall ever having seen the defendant before. When asked, "when you grabbed him, you didn't have any additional information or sighting that he had committed a felony or was about to commit a felony, had you?" Officer Surma replied, "No, I did not." Surma also acknowledged that there is a supermarket very close to the apartment building and that people "normally bring things out of the supermarket in the same type of bag." In his eleven years on the police force, Officer Surma had made five to six arrests for concealed-weapons offenses, and approximately ten narcotics arrests at the Clairmount address. Surma testified that, at the intersection of Clairmount and Woodward, one

might expect to find narcotics, concealed weapons, and prostitutes, and that the police had problems with the building at 60 Clairmount in the past.

## II

Following Officer Surma's testimony at the preliminary examination, the prosecutor moved the court to bind the defendant over to the Recorder's Court as charged. In opposition, defense counsel argued that "[t]here was no probable cause for the initial focus by the police officers"; that defendant was near King Cole's grocery market; that any number of people in that apartment building would have paper bags; that there were any number of reasons "th[at] person would place the paper bag under his vest"; and that this is a "clear case of post hoc probable cause, rationalizing their subsequent actions after pursuing this person on a chimeral [sic] suspicion."

The prosecutor responded:

> [N]ot everybody who has a paper bag tried [sic] to stuff it in their pants and tries to run away from people when they look at them. The officers did have a reasonable suspicion to at least stop the defendant at this point, and he continued to flee. Before he was even stopped, he discarded the bag. There's no search and seizure. It's just a situation that would justify a stop by a police officer and a pat down, which they didn't even get to that point. I don't believe that there's a search and seizure issue here, your Honor.

Defendant countered that the question is not one of search and seizure, but of probable cause for an arrest, and that there was no probable cause for an arrest.

In binding the defendant over for trial, the

district court simply stated, "The Court does find there's a question of fact and does bind the defendant over as charged, carrying a concealed weapon on a person."

At the evidentiary hearing in Recorder's Court, the prosecutor argued that Surma's actions were not unreasonable. He noted that the neighborhood in question was a high-crime area, that defendant was not coming out of a supermarket with a bag of groceries, and that an officer of eleven years "on the street knows pretty much whether—and as he indicated he thought either narcotics or a gun, from his experience and from the Court's, I think knowledge of Clairmount and Woodward would be a very reasonable assumption."

The defendant relied on his "brief and memo" and did not offer argument. After observing that Officer Surma was a "totally credible witness," the court stated it was relying on *People v Terrell,* 77 Mich App 676; 259 NW2d 187 (1977),[3] and granted defendant's motion to suppress the evidence and dismissed the case.

---

[3] In *Terrell* a police officer in a moving police vehicle observed the defendant standing on a street corner, talking to another person. When defendant looked in the direction of the police vehicle, he put his hand in his pocket and began to run toward a nearby apartment building. The officer gave chase on foot because he believed "there could possibly be a gun in Mr. Terrell's pocket . . . ." *Id.* at 678. According to the officer, the defendant, on reaching the apartment building, removed a coin envelope from his pocket and dropped it on the floor. The officer retrieved the envelope, determined that it contained suspected heroin, and arrested the defendant for possession of narcotics.

The Court of Appeals affirmed the trial court's order suppressing the evidence as having been obtained in violation of the defendant's right under the Fourth Amendment of the United States Constitution, because "[a] totality of facts and circumstances which could provide the officer with a reasonable belief that criminal activity may be afoot was simply lacking." The Court of Appeals added:

"Defendant's furtive gestures may have aroused the police officer's general suspicions, but without some additional specific knowledge on the part of the officer they were insufficient to justify an intrusion." *Id.* at 680.

The Court of Appeals, after first observing that "[t]he parties agree that this initial situation is governed by the 'stop and frisk' doctrine enunciated by the United States Supreme Court in *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968)," applied the *Terry* "stop and frisk" standard to the facts of this case and concluded:

> Our examination of the record convinces us that the trial court correctly held that insufficient facts and circumstances existed to provide the police officers with a reasonable belief that criminal activity may have been in progress. Like the factual setting in *Terrell, supra,* defendant's surreptitious gestures may have aroused the officers' general suspicions, but absent specific knowledge on the part of the officers, defendant's actions were insufficient to warrant an investigatory intrusion. The officers' pursuit and stop of the defendant was not justified at its inception and, thus, was an unlawful invasion of defendant's Fourth Amendment rights.
>
> Of particular import to our holding are the following factors: (1) The officers were not investigating a recently committed crime in the area of Clairmount and Woodward Avenues; (2) defendant was unknown to the officers and was not the subject of an arrest warrant; (3) defendant did not resemble an individual suspected of committing a crime; (4) defendant did not have any contraband or weapons visibly on his person; (5) the officers were not in uniform and were travelling in an unmarked police car; and (6) during their pursuit of defendant, the officers did not identify themselves as policemen.

We granted leave to appeal, 418 Mich 950 (1984).

## III

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . . [US Const, Am IV.][4]

The Fourth Amendment is not a guarantee against all searches and seizures, but only against those that are unreasonable. *United States v Sharpe,* 470 US 675; 105 S Ct 1568; 84 L Ed 2d 605 (1985). The Fourth Amendment applies to all seizures of a person, including seizures that involve only a brief detention, short of traditional arrest. *United States v Brignoni-Ponce,* 422 US 873, 878; 95 S Ct 2574; 45 L Ed 2d 607 (1975); *Davis v Mississippi,* 394 US 721; 89 S Ct 1394; 22 L Ed 2d 676 (1969). Prior to *Terry v Ohio, supra,* any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Dunaway v New York,* 442 US 200, 207-209; 99 S Ct 2248; 60 L Ed 2d 824 (1979). *Terry* created a limited exception to the probable cause requirement.

Given the parties' agreement that the lawfulness of the seizure of the revolver in question "is governed by the 'stop and frisk' doctrine enunciated . . . in *Terry,"* we begin our analysis with a review of that case.

In *Terry,* a police officer observed the defendant, along with two other men, engaging in furtive behavior that the Supreme Court described as an "elaborately casual and oft-repeated reconnaissance of [a] store window" in downtown Cleveland which the arresting officer later characterized at

---

[4] Michigan's analogous provision, Const 1963, art 1, § 11, reads:

"The person, houses, papers, and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or thing shall issue without describing them, nor without probable cause, supported by oath or affirmation."

trial as "casing a job, a stickup." The officer, a plain-clothes detective of thirty-five-years experience, concluded that the three men were about to commit a robbery. The officer approached the three men, identified himself as a police officer, and asked for their names. After receiving a mumbled reply, the officer conducted a pat-down search of the three men, obtaining two pistols, one from defendant Terry.

Terry's motion to suppress the evidence was denied, and the denial was affirmed by the Supreme Court of the United States. The Court found that the police conduct constituted a seizure within the meaning of the Fourth Amendment. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 US 16. The Court stated:

> We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a "technical arrest" or a "full-blown search." [392 US 19.]

The constitutional inquiry under *Terry* is whether the seizure and subsequent search are reasonable.

> We must decide whether at that point it was reasonable for [the police officer] to have interfered with petitioner's personal security as he did. And in determining whether the seizure and search were "unreasonable" our inquiry is a dual one— whether the police officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified interference in the first place. [392 US 19-20.]

The Court concluded that there was narrowly

drawn authority to permit a search for weapons where the officer has reason to believe he is dealing with an armed and dangerous individual. The primary thrust of this exception is the basic government interest in protecting its police officers. The specific holding of *Terry* is narrow:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled to the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may be properly introduced in evidence against the person from whom they were taken. [392 US 30-31.]

The Court, in *Terry,* specifically declined to deal with the question of an "investigative seizure upon less than probable cause for purposes of "'detention' and/or interrogation," 392 US 19, n 16, but, in subsequent cases, the Court has developed standards applicable to investigatory stops by police. This development is reviewed and summarized in *United States v Cortez,* 449 US 411, 417-418; 101 S Ct 690; 66 L Ed 2d 621 (1981):

> An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. *Brown v Texas,* 443 US 47, 51 [99 S Ct 2637; 61 L

Ed 2d 357] (1979); *Delaware v Prouse,* 440 US 648, 661 [99 S Ct 1391; 59 L Ed 2d 660] (1979); *United States v Brignoni-Ponce,* [422 US 873, 884; 95 S Ct 2574; 45 L Ed 2d 607 (1975)]; *Adams v Williams,* 407 US 143, 146-149 [92 S Ct 1921; 32 L Ed 2d 612] (1972); *Terry v Ohio, supra,* at 16-19.

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. See, *e.g., Brown v Texas, supra,* at 51; *United States v Brignoni-Ponce, supra,* at 884.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v Ohio, supra,* said that "[t]his demand for specificity in the information upon which police action is predicated is the *central teaching of the Court's Fourth Amendment jurisprudence." Id.,* at 21, n 18. (Emphasis added.) See also *Brown v Texas, supra,* at 51; *Delaware v Prouse, supra,* at 661-663; *United States v Brignoni-Ponce, supra,* at 884.

## IV

In an apparent effort to bring some organization out of the kaleidoscope of Fourth Amendment search and seizure cases decided by the Supreme Court, particularly concerning various kinds of police-citizen encounters, Justice White, in a plurality opinion in *Florida v Royer,* 460 US 491; 103 S Ct 1319; 75 L Ed 2d 229 (1983), divided such encounters into three tiers.[5]

The first tier consists of an officer asking a person questions in a public place.

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See *Dunaway v New York,* [442 US

---

[5] Although Justice White's opinion was not adopted by a majority of the Court, we find this part of his opinion to be a correct and helpful analysis and summary of prior United States Supreme Court Fourth Amendment rulings.

200, 210, n 12; 99 S Ct 2248; 60 L Ed 2d 824]
(1979); *Terry v Ohio,* 392 US at 31, 32-33 (Harlan,
J., concurring), *id.,* at 34 (White, J., concurring).
Nor would the fact that the officer identifies him-
self as a police officer, without more, convert the
encounter into a seizure requiring some level of
objective justification. *United States v Mendenhall,*
446 US 544, 555 [100 S Ct 1870; 64 L Ed 2d 497]
(1980) (opinion of Stewart, J.). The person ap-
proached, however, need not answer any questions
put to him; indeed, he may decline to listen to the
questions at all and may go on his way. *Terry v
Ohio,* 392 US at 32-33 (Harlan, J., concurring), *id.,*
at 34 (White, J., concurring). He may not be de-
tained even momentarily without reasonable, ob-
jective grounds for doing so; and his refusal to
listen or answer does not, without more, furnish
those grounds. *United States v Mendenhall, supra,*
at 556 (opinion of Stewart, J.). If there is no
detention—no seizure within the meaning of the
Fourth Amendment—then no constitutional rights
have been infringed. [460 US 497-498.]

The second tier of contact is the *Terry* stop
described above. As a limited exception to the
general rule that all restraints of the person must
be justified by probable cause, *Terry* provides that
certain seizures are justifiable under the Fourth
Amendment if there is articulable suspicion that a
person has committed or is about to commit a
crime.

Terry and its progeny, nevertheless, created only
limited exceptions to the general rule that seizures
of the person require probable cause to arrest.
Detentions may be "investigative" yet violative of
the Fourth Amendment absent probable cause. In
the name of investigating a person who is no more
than suspected of criminal activity, the police may
not carry out a full search of the person or of his
automobile or other effects. Nor may the police

seek to verify their suspicions by means that approach the conditions of arrest. [460 US 499.][6]

The third tier of contact is the arrest of a person based on probable cause.

This Court repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. [*Michigan v DeFillippo*, 443 US 31, 37; 99 S Ct 2627; 61 L Ed 2d 343 (1979).]

## V

Plainly, the police encounter with defendant in this case was not at either the first or third tier of the *Royer* analysis. The officers did not approach Shabaz merely for the purpose of questioning him, after first identifying themselves as police officers,

---

[6] The essential underpinnings of the *Terry* decision—the police officer's reasonable suspicion that he may be dealing with an "armed and dangerous" person; that "nothing in the initial stages of [his main] encounter serves to dispel his reasonable fear for his own or others' safety"; and that he is entitled to "conduct a carefully limited search . . . in an attempt to discover weapons"—have eroded with time and are no longer conditions precedent to justify a *Terry* stop. Subsequent Supreme Court decisions have ignored the "search for dangerous weapons" requirement of *Terry* and now permit the same kind of limited intrusions upon a citizen's liberty interests under what are called "special law enforcement needs." See *United States v Sharpe, supra.* In addition to the need to disarm an "armed and dangerous person to assure the safety of the police officers and others," *Terry, supra; Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), "*Terry* stops" have been approved in order to conduct border searches for illegal aliens, *United States v Cortez, supra; United States v Brignoni-Ponce, supra;* to conduct airport searches for suspected drug trafficking, *Royer, supra; United States v Place,* 462 US 696; 103 S Ct 2637; 77 L Ed 2d 110 (1983); *United States v Mendenhall, supra;* to conduct stops to investigate past felonies, *United States v Hensley,* 469 US 221; 105 S Ct 675; 83 L Ed 2d 604 (1985), and transportation of large quantities of drugs, *United States v Sharpe, supra.*

nor was the defendant free to "go on his way."
Indeed, when he attempted to "go on his way," he
was pursued and seized by the officers. And when
the officers spotted the defendant and began to
chase him, they did not have probable cause to
arrest him. The prosecutor concedes as much,
acknowledging in his brief and in oral argument,
that the police-citizen encounter in this case was
an "investigatory pursuit and stop," and that its
constitutionality is to be tested according to the
standards announced in *Terry*.[7]

We turn, therefore, to analyze the police encoun-
ter with Shabaz in this case according to the
principles announced in *Terry* and the United
States Supreme Court cases applying *Terry*. While
factually there can be many justifications for a so-
called "*Terry* stop," see footnote 6, the criteria for
a constitutionally valid limited intrusion upon a
citizen's liberty, short of probable cause for arrest,
are that the police must have a particularized
suspicion, based on an objective observation, that
the person stopped has been, is, or is about to be
engaged in criminal wrongdoing. *Brown v Texas,
supra.* As the Supreme Court stated in *United
States v Cortez, supra,* the "articulable reasons" or
"founded suspicion" or "particularized suspicion"
that criminal activity is afoot must derive from
the police officer's assessment of the "whole pic-
ture"—the totality of circumstances with which he
is confronted.

The "whole picture" with which the officers
were confronted in this case, on the evening in
question, can only be described by reference to
individualized facts:

_____

[7] At oral argument, the assistant prosecuting attorney stated that,
as the Court of Appeals stated in this case, the parties are in
agreement that an investigatory pursuit is governed by the principles
of *Terry v Ohio,* and the comparable Michigan authority.

— The defendant was observed on the street at night in a high-crime neighborhood;

— He was seen leaving an apartment building wherein the observing officers had previously made a number of arrests for concealed-weapons violations and narcotics offenses;

— After looking in the direction of the unmarked police vehicle, the defendant was observed "stuffing a [small] paper bag like under his vest" or "in his pants"; and

— When the officers slowed their vehicle to a stop, defendant "took off running."

Whether all of the foregoing factors, considered in their totality, provided the officers with an articulable or particularized suspicion based on objective manifestations that Shabaz was involved in criminal wrongdoing can only be determined by evaluating the individual circumstances and determining whether collectively they are greater than the sum of their parts, and build to form the requisite objective basis for the particularized suspicion that criminal wrongdoing is afoot that would justify a *Terry* stop.

While the crime rate in a neighborhood may be a valid consideration to be taken into account when assessing reasonable suspicion, *United States v Davis*, 147 US App DC 400, 403; 458 F2d 819 (1972); *United States v White*, 211 US App DC 72; 655 F2d 1302 (1981), that alone would not establish the grounds for an investigatory stop. *Brown v Texas, supra*. Defendant's presence in a high-crime neighborhood does nothing to distinguish him from any number of other pedestrians in the area. It provides no particular reasonable basis for suspicion as to the activity of the defendant. The same must be said for his emergence from an apartment building known to the police to be the site of previous criminal activity. It cannot reasonably be concluded that everyone seen carrying a small

paper bag, entering or leaving an apartment build-
ing where previous concealed-weapons and narcot-
ics arrests have been made, is likely to be involved
in such activity. A high neighborhood crime rate
ordinarily requires the presence of both innocent
victims and criminal perpetration in the same
neighborhood.

Similarly, defendant's effort to conceal the paper
bag in his vest, by itself, did not afford grounds for
a stop. There was no evidence that the size or
shape of the bag suggested that it contained a
weapon. It may have contained money, liquor,
food, jewelry, or any number of small items one
might lawfully carry in a small bag and wish to
conceal from view while walking down a darkened
street in a high-crime area. It might, on the other
hand, have contained unlawful contraband or an
illegally concealed weapon. It is precisely because
the officers could only speculate about the contents
of the bag that they had no reasonable or articula-
ble basis to conclude what its contents were.

> [T]he sole fact that individuals may seek to
> conceal the object of their business from poten-
> tially prying eyes, even on the public sidewalk,
> does not grant the police the power to arrest them.
> While it is true that persons engaged in illegal
> transactions will desire to conceal those transac-
> tions, the desire for privacy in one's affairs is
> common among law-abiding persons as well. Thus,
> the police cannot conclude that merely because an
> object or a transaction is not openly displayed, it is
> necessarily illegal. [*United States v Green,* 216 US
> App DC 329, 333; 670 F2d 1148 (1981).]

Because the police could only guess about what
defendant was seeking to hide, their speculation
did not provide a particularized suspicion of pos-
sessory wrongdoing, but only a generalized one.

Considering the totality of the circumstances with which the police were confronted before the defendant began to run, it is clear that the officers were entirely without authority to confront the defendant and require him to submit to an investigatory stop and interrogation because, on the basis of what they had observed, the officers had no articulable or particularized grounds to suspect, reasonably, that the defendant was, had been, or was about to be engaged in criminal activity. Nothing in their observation of him to that point provided the objectively reasonable and articulable suspicion that would justify the limited intrusion upon the defendant's liberty and privacy interests permitted under *Terry.*

What then was added to the picture when the defendant began to run that converted the naked and generalized suspicion of the police officers into articulable grounds to conclude that criminal activity was afoot?

Defendant's flight at the approach of police did not, by itself, in the circumstances of this case, support a reasonable suspicion. Although it is uncontroverted that flight may be a factor to be considered in ascertaining whether there is reasonable suspicion to warrant a *Terry* stop, *United States v Sharpe, supra; United States v Brignoni-Ponce, supra,* flight alone is not a reliable indicator of guilt without other circumstances to make its import less ambiguous. *United States v Green, supra,* 216 US App DC 333; *People v Tebedo,* 81 Mich App 535; 265 NW2d 406 (1978).

Certainly it is reasonable to conclude that the defendant's flight away from the vehicle carrying the police officers might reasonably have heightened the officer's general suspicion that the defendant must have had something to hide and wished to avoid contact with the occupants of the vehicle.

But heightened general suspicion occasioned by the flight of a surveillance subject does not alone supply the particularized, reasoned, articulable basis to conclude that criminal activity was afoot that is required to justify the temporary seizure approved in *Terry*.

If it were otherwise, any citizen who refuses to answer a plain-clothes police officer's investigative questions during a "tier one" inquiry, and instead exercises his constitutional right to "go on his way"—at top speed—would, by the act of exercising his right to "move on," invite a full-blown tier two *Terry* "stop and frisk" not because of the addition of any articulable or particularized suspicion of imminent criminal activity, but because he exercised his right to the freedom of movement the Fourth Amendment guarantees.

That is what occurred here. The officers had no grounds to stop and frisk the defendant when they saw him walking on Clairmount Avenue. They then seized upon his "suspicious" act of running away from the unmarked car as providing the articulable suspicion that criminal activity was underway. What criminal activity? What, in defendant's flight, when considered with the antecedent circumstances, provided a particularized suspicion that he was engaged in the commission of a crime?

It was clear to the officers in *Terry* that when Terry and his friends conducted an "elaborately casual and oft-repeated reconnaissance of the store window on Huron Road," by walking past it first in one direction then another and peering in the window, and "repeated this ritual alternately between five and six times," each time conferring with a third person stationed a short distance away, the suspects were "casing a job, a stick-up." That was the particularized and articulable suspicion of imminent criminal activity that justified

the stop and frisk in *Terry,* and that the United States Supreme Court declared to be a condition precedent to the constitutional validity of such limited intrusions.

If, as the United States Court of Appeals said in *Green, supra,* flight alone is not a reliable indicator of guilt without other circumstances because flight alone is inherently ambiguous, the ambiguity of the defendant's flight in this case is even more evident. The officers were not in uniform, they were driving an unmarked car, they did not identify themselves as police[8] and, upon first observing the defendant, they slowed their vehicle, fixed their attention on the defendant, and then pursued him. It is not unreasonable to expect that a citizen walking along the street in a high-crime area in the dark of night, who is being scrutinized and then "tailed" by three unknown persons in a "private" motor vehicle, would vacate the area at flank speed.

## VI

Assessing collectively the individual factors with which the officers were confronted in dealing with the rapidly unfolding events on Clairmount Avenue, we are unable to conclude that they combined to create a totality of circumstances having any different constitutional quality or significance than did the constituent parts.

Each factor is capable of innocent interpretation, and we find the individual factors here do not build to form the requisite objective basis for the particularized suspicion required to justify a *Terry* stop. The police were not investigating a recently

---

[8] Following *Wong Sun v United States,* 371 US 471, 482; 83 S Ct 407; 9 L Ed 2d 441 (1963), where the officers fail to identify themselves, the suspect's flight must be regarded as ambiguous conduct.

committed crime in the area which may have been linked to the defendant, nor was he known to the officers as a suspect in a crime. There was no contraband visible on defendant's person; the officers could only guess at the contents of the paper bag. The defendant's flight from plain-clothes pursuers in an unmarked car was at most ambiguous, and at least understandable.

We conclude that the circumstances, as they appeared to the police officers on the night in question, considered in their totality, did not provide the requisite particularized suspicion based on objective observation that criminal activity was afoot sufficient to outweigh the defendant's privacy interests under the Fourth Amendment.

Because the seizure of the defendant was unreasonable, in not meeting the requirements of a *Terry* stop, any evidence derived from that seizure must be suppressed as fruit of the poisonous tree. *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963). We find that the weapon would not have been discovered, but for the illegal seizure of the defendant, thus its admission into evidence was properly excluded by the courts below.

## VII

The prosecutor claims that in throwing the paper bag containing the revolver to the floor in the vestibule of the building when he was seized, defendant abandoned the gun, thus cutting off his standing to claim that the evidence was illegally seized.[9] *People v Kirchoff,* 74 Mich App 641; 254 NW2d 793 (1977). We disagree. "Abandonment is

---

[9] Although the assistant prosecutor conceded at oral argument that if the seizure were found to be unreasonable defendant could not be charged with the contents of the bag, she has argued the issue on abandonment in her brief. Therefore, we address it here.

an ultimate fact or conclusion based generally upon a combination of act and intent." *Friedman v United States,* 347 F2d 697, 704 (CA 8, 1965). "The proof supporting abandonment should 'reasonably beget the exclusive inference of throwing away . . . .'" *People v Howard,* 50 NY2d 583, 593; 408 NE2d 908; 430 NYS2d 578 (1980). Here, it is unclear from the evidence whether defendant actually intended to throw away the bag or to continue to conceal it by hiding it in the building vestibule. Thus, we question whether an abandonment has occurred.

Regardless whether abandonment was intended, defendant's actions cannot be used to dissipate the taint flowing from the unreasonable police conduct. Where, as here, the police activity is coercive in nature, we find that it serves to nullify any claim of abandonment. Although defendant divested himself of the bag prior to the officer's actually taking physical hold of him, the pursuit itself by the officers was effectively the seizure of the defendant. A seizure occurs when a reasonable person would have believed that he was not free to leave. *United States v Mendenhall,* 446 US 544; 100 S Ct 1870; 64 L Ed 2d 497 (1980); *Florida v Royer, supra; Terry v Ohio, supra.* As soon as the officers began their pursuit, defendant's freedom was restricted. If he stopped running, he would not be free to leave. Events proved that. Defendant's divestment of the bag was in direct response to his unjustified seizure. Following *Wong Sun v United States, supra,* the fruits of the officers' illegal action are not to be admitted as evidence unless an intervening independent act of free will purges the primary taint of the unlawful invasion. In light of the coercive effect of the seizure of the

defendant, we find that his divestment of the paper bag, and the revolver it contained, does not constitute an independent act sufficient to purge the primary taint of the unlawful seizure.

The Recorder's Court properly suppressed the weapon as evidence.

Affirmed.

LEVIN, BRICKLEY, CAVANAGH, and RILEY, JJ., concurred with RYAN, J.

BOYLE, J. (*dissenting*). This case presents two issues. The first issue is whether the initial contact between the police and the citizen in this case constituted a "seizure" within the ambit of the protections afforded by the Fourth Amendment of the United States Constitution, against such activity.[1] The second issue is whether the officers' conduct was reasonable, assuming the applicability of the Fourth Amendment, *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), when judged by the totality of circumstances at the time of the incident, *United States v Cortez,* 449 US 411; 101 S Ct 690; 66 L Ed 2d 621 (1981).

## I

The first issue has not yet been authoritatively

---

[1] The prosecuting attorney in this case has conceded that the police officers' conduct involved Fourth Amendment activity and, as such, is governed by the standards for investigative detention set forth in *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). However, we are not bound by the prosecutor's interpretation of the case and may consider and analyze the facts and issues independent of such a concession. The United States Supreme Court in one of the companion cases to *Terry, Sibron v New York,* 392 US 40, 58-59; 88 S Ct 1889; 20 L Ed 2d 917 (1968), disregarded the state's representation of error and decided the case on its merits, noting:

" '[O]ur judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of the parties.' . . . For us to accept his view blindly . . . would be a disservice to the State of New York and an abdication of our obligation to lower courts to decide cases upon proper constitutional grounds in a manner which permits them to conform their future behavior to the demands of the Constitution."

resolved by any decision of this Court or of the United States Supreme Court. It was foreshadowed almost twenty years ago by Justice Harlan's concurrence in *Terry, supra.* Writing separately, "to fill in a few gaps, as I see them, in [the majority] opinion" at 31-32, Justice Harlan stated:

> In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection he must first have a right not to avoid him but to be in his presence.

Despite Justice Harlan's prescient observation, the opinions in *Terry* and the companion cases focused[2] attention on the pat down of Mr. Terry, and the pocket searches of the defendants in the companion cases. As Professor LaFave has noted:

> The failure of the majority to heed [Justice Harlan's] advice, it would seem, was unwise, for the Court thereby detoured around the threshold issue about stop and frisk, one on which courts, lawyers and police deserve guidance. [LaFave, Search and Seizure, § 9.3, p 64.]

Research has disclosed only two United States Supreme Court cases[3] providing guidance for resolution of whether the conduct here constituted a stop.

---

[2] *Sibron v New York, supra.*

[3] At least two other state jurisdictions have considered, and come to different conclusions about, whether there was a seizure in cases with facts similar to those in the instant case. Compare *State v Saia*, 302 So 2d 869 (La, 1974) (seizure), with *State v Sheffield*, 62 NJ 441; 303 A2d 68 (1973) (no seizure).

In *United States v Mendenhall,* 446 US 544; 100
S Ct 1870; 64 L Ed 2d 497 (1980), the Court
considered whether a "seizure" had taken place
when agents approached the defendant in an air-
port concourse and asked questions of her. In
concluding that it had not, two justices noted that
the Court in *Terry* had apparently and correctly
assumed that a seizure had not taken place before
the officer physically restrained Terry for purposes
of searching his person for weapons. *Mendenhall,*
*supra* at 552-553. The justices stated:

> We adhere to the view that a person is "seized"
> only when, by means of physical force or a show of
> authority, his freedom of movement is restrained.
> Only when such restraint is imposed is there any
> foundation whatever for invoking constitutional
> safeguards. [*Id.* at 553.]

Analyzing the facts, Justices Stewart and Rehn-
quist observed that the events took place in a
public concourse, the agents wore no uniforms and
displayed no weapons, they did not summon the
respondent to their presence, but instead ap-
proached her and identified themselves as federal
agents. "Such conduct, without more, did not
amount to an intrusion upon any constitutionally
protected interest."[4] *Id.* at 555.

In *Immigration and Naturalization Service v
Delgado,* 466 US 210; 104 S Ct 1758; 80 L Ed 2d
247 (1984), an action for injunctive and declaratory
relief was brought by employees and their union,
seeking to prevent the Immigration and Naturali-

---

[4] Concurring Justices Powell and Blackmun and the Chief Justice
did not reach the issue as to whether the initial stop was a seizure.

"For me, the question whether the respondent in this case reason-
ably could have thought she was free to 'walk away' when asked by
two Government agents for her driver's license and ticket is ex-
tremely close." *Id.* at 560.

zation Service from conducting "factory surveys" of the work force at a garment factory. Applying *Mendenhall, supra,* the Court of Appeals for the Ninth Circuit held that the stationing of agents at the doors to the buildings during the one to three hours that other agents approached workers and asked questions about employee citizenship constituted a seizure of the entire work force because "a reasonable worker 'would have believed that he was not free to leave,'" *Int'l Ladies' Garment Workers' Union v Sureck,* 681 F2d 624, 634 (CA 9, 1982). Consequently the Court of Appeals held that individual questioning of the employees violated the Fourth Amendment because there had been no reasonable suspicion or probable cause as to any of them.

In reversing the Court of Appeals, the majority held that interrogation relating to one's identity or a request for identification does not by itself constitute a Fourth Amendment seizure, despite the claim that the manner in which the surveys were conducted created a psychological environment which made the employees reasonably afraid they were not free to leave.

Justices Brennan and Marshall, concurring in part and dissenting in part, believed that the employees were seized within the meaning of the Fourth Amendment when they were "accosted by the INS agents and questioned" by them in circumstances which "demonstrated a 'show of authority' . . . [that would] overbear the will of any reasonable person."[5]

While neither *Mendenhall* nor *Delgado* dispose of the issue presented here, they do illustrate that

[5] See also *United States v Barnes,* 496 A2d 1040 (DC App, 1985) (no seizure where police officers approached defendant on the street, asked two questions, and requested that defendant remove his hands from his pockets).

the Court has applied the test of a reasonable apprehension of a citizen not to be free to go, *only* to determine whether an actual confrontation between a citizen and the police for interrogation purposes has become a seizure requiring further justification. See also *Brown v Texas,* 443 US 47; 99 S Ct 2637; 61 L Ed 2d 357 (1979).

I would conclude that on this record there was not an intrusion on protected interests sufficient to constitute a stop. While the reasonable belief of an individual actually stopped by the police is relevant to whether a seizure has occurred, the threshold issue, whether there has been a "stop," is one of law. I would find on this record that one individual running after another is, as a matter of law, not a detention for investigation. The defendant's flight prevented any request for an explanation of his behavior. On these facts, not even a "forcible stop," *Terry, supra* (Harlan, J., *concurring*), triggering Fourth Amendment protection had occurred before the defendant discarded the bag.

## II

Even if running after the defendant was a "stop," it is clear that the seizure was justified by a reasonable suspicion, based on objective facts, that the defendant was involved in criminal activity.

Since *Terry v Ohio, supra,* the Court has determined the propriety of *Terry*-type activity by balancing the extent of the intrusion on the individual's rights against the right of the public to be free from criminal activity. *Terry v Ohio, supra; Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972); *United States v Brignoni-Ponce,* 422 US 873; 95 S Ct 2574; 45 L Ed 2d 607 (1975).

In his *Mendenhall* concurrence, Justice Powell,

joined by Chief Justice Burger and Justice Blackmun, determined that the initial stop of the defendant was a stop protected by the Fourth Amendment, but that the stop was reasonable. *Mendenhall, supra* at 560-566. Justice Powell wrote that "[t]he jurisprudence of the Fourth Amendment demands consideration of the public's interest in effective law enforcement as well as each person's constitutionally secured right to be free from unreasonable searches and seizures." *Id.,* p 565. After balancing the public interest against the extent of the intrusion, in light of all the circumstances of the case, Justice Powell concluded that the stop was reasonable.

There can be no debate that unlawful use of handguns constitutes a serious threat to public safety. According to figures compiled by the Federal Bureau of Investigation, firearms were responsible for sixty percent of the 18,692 murders and nonnegligent manslaughters committed nationwide in 1984. The FBI also reports that firearms were used in thirty-six percent of the 485,008 robberies committed in 1984. According to the Detroit Police Department, in the first six months of 1985, firearms were responsible for 157 homicides in Detroit alone.

Balanced against the public's right to be free from the employment of firearms for criminal use, is the limited nature of the intrusion on the defendant in this case.[6] A pursuit in the attempt to stop to ascertain whether or not a weapon is being concealed is a minuscule intrusion when weighed against the havoc caused by weapons.

Applying the balancing test first articulated in

---

[6] The limited intrusion in this case is especially apparent when considering what is *not* involved here. The officers did not search the defendant's home or car, nor did they even conduct a search of the defendant. Nor was there any interrogation.

*Terry,* the United States Supreme Court has approved a forcible stop to investigate an informant's tip that the suspect was armed and carrying narcotics, *Adams v Williams, supra,* a brief stop of a moving vehicle to investigate a reasonable suspicion that its occupants were involved in criminal activity, *United States v Brignoni-Ponce, supra,* and a temporary detention of the occupant of a house while a search warrant for the house was being executed, *Michigan v Summers,* 452 US 692; 101 S Ct 2587; 69 L Ed 2d 340 (1981). Most recently the court has approved an investigative stop based on a reasonable suspicion of *past* criminal activity, *United States v Hensley,* 469 US 221; 105 S Ct 675; 83 L Ed 2d 604 (1985).

Moreover, since *Terry,* the Supreme Court has consistently held that the "reasonable suspicion" required for a valid investigative stop must be judged by the totality of the circumstances at the time of the incident. As the majority observes, this totality has been specifically held to include the experience and heightened perceptions of the police officers involved, *United States v Cortez, supra.*

It is true that *flight* alone cannot give rise to probable cause, since, were it otherwise, anyone who does not desire to talk to the police and who either walks or runs away from them would always be subject to legal arrest. LaFave, Search and Seizure, § 3.6, p 669.

It is also true that concealment itself may be insufficient to justify a stop. *Id.* The majority has not, however, set forth authority justifying the conclusion that, in combination, the observation by experienced police officers of concealment and flight may not provide a reasonable suspicion that criminal activity is occurring. Indeed, the case cited by the majority, *United States v Green,* 216

US App DC 329; 670 F2d 1148 (1981), not only does not support the conclusion of the majority that the officers had only a generalized suspicion, it is actually a holding that the officers' observation of activity typical of a narcotics transaction, the concealment of a brown paper bag and the flight and evasion by defendant when approached by an unmarked police car, constituted probable cause for arrest. *Id.* at 332.

The majority has discredited the inference which reasonable police officers might draw and has bifurcated the circumstances to conclude that the sum of the circumstances is not "greater than the sum of their parts." *Ante,* p 60.

The purported justification for their conclusion is that each circumstance may have been innocent. This analysis obscures the significance of the officers' experience and renders the totality of circumstances test meaningless. As the United States Court of Appeals for the Ninth Circuit noted in *United States v Holland,* 510 F2d 453, 455 (CA 9, 1975):

> Clearly, the officers were not required to rule out all possibility of innocent behavior before initiating a brief stop . . . . The test is founded suspicion . . . . Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act before their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent.

See also *United States v Viegas,* 639 F2d 42 (CA 1, 1981), and *United States v Black,* 675 F2d 129 (CA 7, 1982).

The defendant in this case was seen by two

experienced police officers[7] in a high-crime area, late at night, leaving a building in which one of the officers had previously made over fifteen arrests for concealed-weapons and narcotics offenses. Upon leaving the building, the defendant was seen "stuffing a paper bag like under his vest" or "in his pants." After seeing the two officers stop their vehicle, the defendant began running down the street. At this point, the officers began pursuit.[8]

[7] Although courts have sometimes been concerned in cases such as this that police may unconstitutionally stop a citizen and then later seek to justify their actions with fabricated or unsubstantiated facts (see Landynski, *The Supreme Court's search for Fourth Amendment standards: The problem of stop and frisk,* 45 Conn B J 146 [1971]), in this case it is important to note that there is no indication that the events did not happen exactly as the officer related them. In fact, the trial court specifically found the testimony of Officer Surma to be highly credible.

[8] A recent decision of the United States Supreme Court, *United States v Sharpe,* 470 US 675; 105 S Ct 1568; 84 L Ed 2d 605 (1985), not only supports the observation by the majority "that flight may be a factor" (*ante,* p 62) in the determination of reasonable suspicion, but also offers instruction on the proper disposition of the instant case.

In *Sharpe,* an agent of the Drug Enforcement Administration (DEA) noticed a pickup truck with an attached camper traveling on the highway in tandem with another vehicle. After observing that the truck was riding low in the rear, that the camper did not sway or bounce when the truck drove over bumps or around curves, and that quilted material covered the rear and side windows of the camper, the DEA agent followed the vehicles for approximately twenty miles as they proceeded into South Carolina. At this time, the agent decided to make an investigative stop and contacted the state police for assistance. After the police officers signaled the lead car to stop, the pickup truck cut between the car and the patrol vehicle and continued down the highway. The state police pursued the truck and finally stopped it about one-half mile down the road. When the DEA agent arrived, he investigated further and, finding that the truck did not sink when he stepped on the back and that there was a strange smell emanating from the camper windows, he opened the rear door and found bales of marijuana. The *Sharpe* Court upheld the detention and search, holding that there was no violation of the Fourth Amendment.

The majority concluded that the Court of Appeals assumption that the police had an articulable and reasonable suspicion that defendants were engaged in marijuana trafficking, given the setting and all the circumstances when the police attempted to stop the vehicles, was abundantly supported by the record. The factors were noted as follows: the agents observed the vehicles in an area known to be

We would conclude that any "seizure" of defendant here was based on reasonable suspicion and that the seizure of the bag was therefore justified. The bag was observed by the officer in plain view in a place where he had a lawful right to be, *Harris v United States,* 390 US 234; 88 S Ct 992; 19 L Ed 2d 1067 (1968).

I would reverse and remand to the trial court.

WILLIAMS, C.J., concurred with BOYLE, J.

frequented by drug traffickers; the pickup truck was a type used to transport marijuana; the truck appeared to be heavily loaded and its windows were covered with bed sheet material, the vehicles took evasive actions and started speeding when the officer began to follow them in his marked car. The Court noted: "Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation." *Id.,* p 683.

Justice Marshall's concurrence and Justice Brennan's dissent also shed light on the correct resolution of this case. Justice Marshall concurred because "the evasive actions of the defendants here turned what otherwise would have been a permissibly brief *Terry* stop into the prolonged encounter now at issue." *Id.,* pp 688-689.

Justice Brennan, dissenting because the Court was making a de facto factual determination of evasiveness, also engaged in discussion instructive for our present purposes:

"I had thought it rather well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest. See, *e.g., Peters v New York,* decided together with *Sibron v New York,* 392 US 40, 66-67, companion case to *Terry* ('deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest')."

While this case does not involve a question whether knowledge of the officer was sufficiently specific to constitute probable cause when combined with flight, as the most recent discussion of the Court, *Sharpe* is notable as suggesting that there is no basis in the opinions of the United States Supreme Court for the decision reached today.