PEOPLE v BLOXSON

Docket No. 159646. Submitted September 14, 1993, at Lansing. Decided May 16, 1994, at 9:05 A.M. Leave to appeal sought.

Derrick D. Bloxson was charged in the Ingham Circuit Court with possession with intent to deliver less than fifty grams of a mixture containing cocaine, carrying a concealed weapon, resisting and obstructing a police officer, and possession of a firearm during the commission of a felony. The charges arose out of the questioning of the defendant by a state police officer assigned to a drug interdiction unit who had approached the defendant on a public bus, stood in the aisle beside the seated defendant, and asked the defendant several times whether he had a weapon. Despite several negative responses from the defendant, the officer eventually got the defendant to admit that he had a gun in a bag he had on the seat beside him, and, thereafter, the defendant was arrested. Following an evidentiary hearing, the court, James R. Giddings, J., granted the defendant's motion to suppress the evidence, including the defendant's statement to the officer, resulting from the confrontation and arrest, finding that under the circumstances a reasonable person would not have felt free to leave, and, accordingly, the seizure was unreasonable. The prosecution appealed.

The Court of Appeals *held:*

Because the police officer had no reasonable basis to suspect that the defendant was engaged in a criminal activity, he had no basis to justify an investigative detention of the defendant. The officer's questioning of the defendant would be proper only if under the circumstances a reasonable person in the defendant's position would feel free to decline the officer's requests or otherwise terminate the encounter. Given the continued questioning of the defendant following his initial negative

REFERENCES

Am Jur 2d, Searches and Seizures §§ 3, 32, 50.

Law enforcement officer's authority, under Federal Constitution's Fourth Amendment, to stop and briefly detain, and to conduct limited protective search of or "frisk," for investigative purposes, person suspected of criminal activity—Supreme Court cases. 104 L Ed 2d 1046.

responses and the physical positioning of the officer relative to the defendant, the trial court clearly did not err in holding that the defendant was the subject of an unreasonable seizure and that the evidence thereby obtained was the fruit of that seizure and must be suppressed.

Affirmed.

FITZGERALD, J., concurring, stated that, under the totality of the circumstances, even a wrongfully accused innocent person would not have felt free to terminate the encounter.

TAYLOR, J., dissenting, stated that the circumstances of the encounter in this case would not have led a reasonable innocent person to feel unable to terminate the encounter and that, in fact, this defendant does not appear to have felt unable to terminate the encounter. Accordingly, the officer's conduct was not the type of conduct proscribed by the Fourth Amendment, and the trial court erred in granting the motion to suppress. The order suppressing the evidence should be reversed.

SEARCHES AND SEIZURES — PUBLIC TRANSPORTATION — NONINVESTIGATIVE DETENTION.

Police questioning of persons on public transportation for whom there is not a sufficient basis for investigative detention is proper and not violative of the Fourth Amendment only if under the circumstances a reasonable person in the same position would feel free to decline the officer's requests or otherwise terminate the encounter.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Donald E. Martin,* Prosecuting Attorney, and *Barbara A. VanderVoord,* Assistant Prosecuting Attorney, for the people.

*Hubbard, Fox, Thomas, White & Bengtson, P.C.* (by *Thomas A. Bengtson*), for the defendant.

Before: HOLBROOK, JR., P.J., and FITZGERALD and TAYLOR, JJ.

HOLBROOK, JR., P.J. Defendant was charged with possession with intent to deliver less than fifty grams of a mixture containing cocaine, MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv), carrying a concealed weapon, MCL 750.227; MSA

28.424, resisting and obstructing a police officer, MCL 750.479; MSA 28.747, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Following a suppression hearing, the circuit court determined that there was an unreasonable seizure and suppressed the relevant evidence. The prosecutor appeals as of right. We affirm.

The parties do not dispute the facts. Jaime Corona of the Michigan State Police was assigned to the drug interdiction unit. Traveling to various public transportation stations to thwart the transport of narcotics and weapons on public carriers, members of the drug interdiction unit were trained to observe certain characteristics in people. On June 9, 1992, Detective Corona and two detectives from the Ingham County Sheriff's Department boarded a westbound bus in Lansing. The detectives were casually dressed and were not in uniforms. The three detectives did not display any guns. The two county detectives sat in the rear of the bus.

There were fifteen to twenty people randomly seated on the bus. When Detective Corona entered the bus, two people immediately caught his attention. The detective walked up to the defendant, identified himself by showing his credentials, and asked to speak with him. The detective stated that he was making citizen contact with people because the police were aware that people were using buses to transport weapons and narcotics. The detective asked the defendant if he had any weapons, and the defendant said, "No." The detective observed the defendant's nervousness, evidenced by the defendant's shaking hands, his feet tapping on the ground, and his watery eyes. The detective also saw a duffel bag on the seat next to the defendant. The bag was partially unzipped, and

the defendant's hand covered the open end of the bag. Detective Corona again asked if the defendant had any weapons, and the defendant said, "No." The detective did not advise the defendant that he could decline to speak with the detective. Detective Corona then asked the defendant whether he could look in the bag. The defendant said, "I really don't see the reason." The record does not indicate whether the defendant was advised that he had the right to refuse consent to a search of the bag. The detective asked the defendant why he was acting nervously. The detective then told the defendant that he sensed that the defendant had something illegal in the bag and that he should just be honest and let him know what was in the bag. During this questioning, the detective was standing in the bus aisle next to the seat in front of the defendant. The defendant then admitted that he had a gun in the bag and removed his hand to reveal it. Because the defendant kept returning his hand to the bag, the detective told him he was under arrest and asked him to stand. The defendant stood and physically confronted the detective. The other two detectives helped arrest the defendant. The other suspect who initially caught Detective Corona's attention was arrested also.

In granting the defendant's motion to suppress the evidence, the circuit court took into account the physical position of the detective standing in the bus aisle and determined that a reasonable person would not feel free to leave. The court also noted that the defendant neither was advised that he was free to leave nor was told that he did not have to consent.

The trial court's decision to grant a motion to suppress evidence will not be reversed unless it is clearly erroneous. *People v Burrell,* 417 Mich 439,

448; 339 NW2d 403 (1983); *People v Muro,* 197 Mich App 745, 747; 496 NW2d 401 (1993).

The Supreme Court in *People v Faucett,* 442 Mich 153, 157-158; 499 NW2d 764 (1993), recently stated:

> The Fourth Amendment, then, protects citizens from *unreasonable* searches and seizures. *Terry v Ohio,* 392 US 1, 9; 88 S Ct 1868; 20 L Ed 2d 889 (1968); *United States v Brignoni-Ponce,* 422 US 873, 878; 95 S Ct 2574; 45 L Ed 2d 607 (1975); *United States v Sharpe,* 470 US 675, 682; 105 S Ct 1568; 84 L Ed 2d 605 (1985); *People v Shabaz,* 424 Mich 42, 52; 378 NW2d 451 (1985). The reasonableness of a Fourth Amendment seizure balances the governmental interest that justifies the intrusion against an individual's right to be free of arbitrary police interference. *Terry, supra* at 20-21; *Brignoni-Ponce, supra.*
>
> In addition, the federal constitutional protections against unreasonable searches and seizures have been extended to state proceedings through the Due Process Clause of the Fourteenth Amendment. See *Mapp v Ohio,* 367 US 643, 655; 81 S Ct 1684; 6 L Ed 2d 1081 (1961); *People v Nash,* 418 Mich 196, 211; 341 NW2d 439 (1983) (opinion of BRICKLEY, J.); *People v Burrell,* 417 Mich 439, 448, n 15; 339 NW2d 403 (1983). Because the Michigan Constitution does not provide more protection than its federal counterpart, under the circumstances of this case, federal law controls our inquiry. Thus, consideration of defendant's motion for exclusion of the marijuana necessarily implicates his federal constitutional rights. See *People v Toohey* 438 Mich 265, 270-271; 475 NW2d 16 (1991), and *People v Collins,* 438 Mich 8, 25-31; 475 NW2d 684 (1991). [Emphasis in the original.]

Similarly, federal law is applicable in determining the issue presented in the present case.

The court in *United States v Johnson,* 910 F2d

1506, 1508 (CA 7, 1990), stated the extent of
Fourth Amendment protections in the three cate-
gories of encounters between the police and citi-
zens:

> The first category is an arrest, for which the
> Fourth Amendment requires that police have
> probable cause to believe that a person has com-
> mitted or is committing a crime. The second cate-
> gory is an investigatory stop, which is limited to a
> brief, non-intrusive detention. This is also a
> Fourth Amendment 'seizure,' but the officer need
> only have specific and articulable facts sufficient to
> give rise to a reasonable suspicion that a person
> has committed or is committing a crime. The third
> category involves no restraint on the citizen's
> liberty, and is characterized by an officer seeking
> the citizen's voluntary cooperation through non-
> coercive questioning. This is not a seizure within
> the meaning of the Fourth Amendment. [Citations
> omitted.]

First, we must determine whether the defendant
was seized within the meaning of the Fourth
Amendment. In *Florida v Bostick*, 501 US 429; 111
S Ct 2382; 115 L Ed 2d 389 (1991), the United
States Supreme Court held that drug interdiction
agents may approach individuals on a bus, ask
them questions, and request consent to search
their luggage as long as a reasonable person would
understand that he could refuse to cooperate. In
*Bostick*, two officers boarded a bus and asked to
inspect the defendant's ticket and identification.
The ticket matched the defendant's identification.
The officers identified themselves as narcotics
agents and explained that they were looking for
illegal drugs. They specifically advised the defen-
dant that he had the right to refuse consent. The
agents requested the defendant's consent to search
his luggage. The defendant consented to the

search, and contraband was found in one of his bags. Although one of the officers carried a zipper pouch containing a pistol, it was neither removed from the pouch nor used in a threatening manner.

The United States Supreme Court in *Bostick* held that the Florida Supreme Court had erred in focusing on whether the defendant was free to leave and in adopting a rule that a police drug interdiction encounter on a bus necessarily constitutes an unreasonable seizure per se. *Id.* at 435-436, 439-440. Indeed, even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual as long as they do not convey a message that compliance with their requests is required. *Id.* at 434-435. In *Bostick,* it was stated that *Immigration & Naturalization Service v Delgado,* 466 US 210; 104 S Ct 1758; 80 L Ed 2d 247 (1984), is dispositive in determining whether police conduct is coercive. In *Delgado,* agents of the Immigration and Naturalization Service visited factories to question employees with respect to whether they were illegal aliens. Ins agents stood near the buildings' exits while other agents questioned workers on the job. The confinement that the workers felt was not the result of police activity, but was the result of the workers' voluntary obligations to their employers. *Id.* at 218. Consequently, there was no seizure in *Delgado,* because the agents' conduct gave the employees no reason to believe that they would be detained if they answered the questions honestly or if they simply refused to answer. *Id.*

When determining the reasonableness of a seizure on a bus, courts must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or other-

wise terminate the encounter. *Bostick, supra* at
402. The Court refrained from deciding whether a
seizure occurred in *Bostick,* because the trial court
had made no express findings of fact and because
the Florida Supreme Court improperly had based
its decision on the sole fact that the encounter
took place on a bus.

Other federal courts have applied these princi-
ples in considering whether encounters between
the police and individuals constituted a lawful
seizure. In *United States v Bloom,* 975 F2d 1447,
1453-1456 (CA 10, 1992), the court decided that a
seizure of the defendant occurred when narcotics
agents questioned him concerning whether he was
transporting drugs while the defendant was con-
fined in a private train compartment without first
having been advised that he was free to decline
the agents' request or to terminate the encounter.
Likewise, in *United States v Wilson,* 953 F2d 116
(CA 4, 1991), an officer's prolonged and persistent
questioning of the defendant, who had indicated
his unwillingness to continue the encounter, and
the officer's following and questioning of the defen-
dant through an airport constituted investigative
detention. However, in *United States v Gonzales,*
979 F2d 711 (CA 9, 1992), the court determined
that the district court clearly did not err in ruling
that the seizure on a bus of a bag containing
marijuana was lawful where the defendant was
not advised of his right to terminate the encoun-
ter, the agent who questioned the defendant was
in uniform and armed, and there was no evidence
that the defendant knew the agent could ask him
to get off the bus if the defendant refused to
answer questions. In addition, the court in *United
States v Washington,* 957 F2d 559, 562 (CA 8,
1992), agreed with the district court's determina-
tion that there was no coercion or restraint of

liberty where the defendant was not physically detained or restrained and the defendant voluntarily talked to the detectives and produced identification and a train ticket.

After comparing the above cases with the present case and applying the principles espoused in *Bostick,* we believe that the police conduct in this case would convey to a reasonable person that he was not at liberty to ignore the police presence and go about his business. 501 US 437, citing *Michigan v Chesternut,* 486 US 567, 569; 108 S Ct 1975; 100 L Ed 2d 565 (1988). The detective in the present case asked the defendant if he had any weapons, and despite a negative response, the detective again asked if the defendant had any weapons. Although the confinement on the bus was not the result of police conduct, *Bostick, supra* at 436, one circumstance to consider is the fact that the detective was standing over the defendant and between the defendant and the bus door. Like the officers in *Bostick,* the detective in this case did not threaten the defendant by displaying a gun. However, unlike *Bostick, supra* at 432, the detective failed to advise the defendant that he had the right to refuse consent. The detective asked to look in the defendant's bag and the defendant denied the request. We disagree with the prosecutor's contention that the defendant's response at this point proves that a reasonable person would know that he was free to decline the detective's request. The repetitive, potentially incriminating questions undoubtedly would lead a reasonable person to believe that he was less able to terminate the encounter. *Wilson, supra.* Considering all the circumstances surrounding the encounter, we conclude that the detective's conduct communicated to the defendant, as it would to any reasonable person, that he was not free to decline

the requests. Thus, the encounter involved a restraint on liberty sufficient to become a seizure of the defendant that necessarily implicated the defendant's Fourth Amendment rights as set forth in *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

Next, we must determine whether the seizure was based on a reasonable suspicion supported by articulable facts that criminal activity might be afoot. *Id.* at 30; *United States v Sokolow,* 490 US 1, 7; 109 S Ct 1581; 104 L Ed 2d 1 (1989). The standard of review to be applied to the lower court's factual findings concerning the detective's suspicion of criminal activity is whether the findings are clearly erroneous, but the question whether such suspicion was reasonable under the Fourth Amendment is a question of law that we review de novo. *Bloom, supra* at 1456. Like the district court in *Bloom,* the lower court in this case did not consider specifically whether the seizure was supported by a reasonable suspicion. However, because the facts are undisputed, we must determine as a matter of law whether Detective Corona's suspicion was reasonable under the Fourth Amendment. *Id.* Accordingly, we must consider the totality of the circumstances in deciding the legality of the seizure. *Sokolow, supra* at 8.

There was a reasonable suspicion to justify an investigative stop in *United States v Glover,* 957 F2d 1004, 1010-1011 (CA 2, 1992), where the defendant was traveling on an early morning express bus that had been used by drug carriers to transport narcotics from a "source city" of narcotics for western New York. When the defendant left the bus, he was sweating profusely and was nervously looking around the bus terminal. The defendant entered a different terminal than the other passengers in an extremely slow manner while continu-

ally scanning the entire terminal. When confronted by the officers, the defendant produced two pieces of identification that bore different addresses. Similarly, in *Washington, supra* at 563, the court found that the police had a reasonable suspicion to justify the investigative stop where the codefendant had traveled from a known source city for drugs and paid for a one-way train ticket in cash. The codefendant lived within two blocks of the defendant, arrived on the same train with him, and talked with him in the station lobby, yet denied knowing the defendant. The codefendant also denied ownership of a suitcase that the detective had seen him carry into the train station. Also, in *United States v Manuel,* 791 F Supp 265, 269 (D Kan, 1992), the district court found that there were articulable facts justifying the investigative stop where the defendant arrived on a bus and was visiting a person whose last name and address he did not know. The defendant was supposed to dial a telephone number given to him so that someone could pick him up, and he did not know the contents of a package he was carrying that was wrapped in Christmas paper in late January.

On the other hand, the court in *Bloom, supra* at 1458-1459, decided that no reasonable suspicion of criminal activity existed to justify the investigative detention of a train passenger in his private compartment. The defendant in *Bloom* appeared nervous and somewhat agitated in the presence of the Drug Enforcement Administration agents. One of the agents was visibly armed. The agents identified themselves, and the defendant agreed to speak with them. After confirming the defendant's travel plans, one of the agents told the defendant that he had a problem on board the train with people carrying drugs in their luggage. The defendant

declined consent to a search of his luggage and stated that he was taking the remains of his mother to New York for burial. The agents checked the defendant's story with the train attendant. The agents then seized the defendant's luggage over his objection.

The court in *Wilson, supra* at 123-127, also found that the police did not have a reasonable suspicion to justify an investigative stop where the officer observed a bulge in the defendant's coat pocket, the defendant glanced over his shoulder a few times when he walked through the airport terminal, and the defendant produced only a check-cashing card for identification. The defendant also falsely claimed that he was coming from Boston. The defendant consented to a search of his luggage and of himself, but refused to consent to a search of his coat.

We find that the facts in the present case did not create a reasonable suspicion that criminal activity was afoot. The defendant told the detective twice that he did not have any weapons. The defendant also declined consent to the search of the bag next to him. Under these circumstances, if the police were permitted to disregard the suspect's attempts to decline consent and to instead persist until reasonable suspicion was created, the Fourth Amendment would be diminished greatly in its intended role as the bulwark against overbearing police conduct. *Wilson, supra* at 126, citing *Terry, supra* at 15. Although the defendant appeared to the detective to be nervous, nervousness alone is insufficient to create a reasonable suspicion of criminal activity. *United States v $83,900 in United States Currency,* 774 F Supp 1305, 1317 (D Kan, 1991).

When Detective Corona entered the bus, the defendant was one of the two people who immedi-

ately caught his attention. The detective was trained to observe certain characteristics in people. However, any special observations must be articulated to the courts, and its reasonableness as a basis for the seizure assessed independently of the detective's subjective assertions. *United States v Gooding*, 695 F2d 78, 82 (CA 4, 1982). The only characteristic that the detective articulated to the court that made him immediately observe the defendant was that the defendant was seated sideways in his seat and was watching people enter the bus. We believe that the defendant's actions were consistent with innocent travel and that any degree of suspicion that attached to his actions was minimal. *Bloom, supra* at 1458, citing *Sokolow, supra* at 9-10. Only after the detective accused the defendant of carrying something illegal and asked him to be honest did the defendant admit that he had a gun in the bag.

Considering the totality of the circumstances, we believe that the prosecution failed to meet its burden to demonstrate that the seizure was limited sufficiently in scope and duration to satisfy the conditions of the investigative seizure. *Florida v Royer*, 460 US 491, 500; 103 S Ct 1319; 75 L Ed 2d 229 (1983). We conclude that the detective did not have a reasonable suspicion based on articulable facts to justify the investigative stop. Because Detective Corona seized the defendant without a reasonable suspicion when the detective accused him of criminal activity, the defendant's subsequent answer that he had a gun in the bag was the tainted fruit of the unlawful seizure of the defendant's person. *Bloom, supra* at 1458-1459. Thus, the circuit court did not clearly err in suppressing the evidence. *Burrell, supra.*

Affirmed.

FITZGERALD, J. *(concurring)*. I concur in Judge HOLBROOK's opinion. I write separately, however, to acknowledge Justice Marshall's dissenting opinion in *Florida v Bostick,* 501 US 429, 441; 111 S Ct 2382; 115 L Ed 2d 389 (1991), wherein he realistically portrayed what is occurring in this country in an attempt to halt the "war on drugs":

> Typically, under this technique, a group of state or federal officers will board a bus while it is stopped at an intermediate point on its route. Often displaying badges, weapons or other indicia of authority, the officers identify themselves and announce their purpose to intercept drug traffickers. They proceed to approach individual passengers, requesting them to show identification, produce their tickets, and explain the purpose of their travels. Never do the officers advise the passengers that they are free not to speak with the officers. An "interview" of this type ordinarily culminates in a request for consent to search the passenger's luggage.
>
> These sweeps are conducted in "dragnet" style. The police admittedly act without an "articulable suspicion" in deciding which passengers to approach for interviewing. [Citations omitted.]

In discussing the "suspicionless sweep," the dissent, quoting *State v Kerwick,* 512 So 2d 347, 348-349 (Fla, 1987), stated at 443:

> " '[T]he evidence in this cause has evoked images of other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption, by individuals who held temporary power in the Government. The spectre of American citizens being asked, by badge-wielding police, for identification, travel papers—in short a raison d'etre—is foreign to *any* fair reading of the Constitution, and its guarantee of human liberties. This is not Hitler's Berlin, nor

Stalin's Moscow, nor is it white supremacist South Africa. Yet in Broward County, Florida, these police officers approach every person on board buses and trains ("that time permits") and check identification [and] tickets, [and] ask to search luggage—all in the name of "voluntary cooperation" with law enforcement.' "

I agree with the dissent in *Bostick* that "the suspicionless, dragnet-style sweep of buses in intrastate and interstate travel" is not consistent with the Fourth Amendment. *Bostick, supra* at 444.

Nonetheless, following Supreme Court precedent, as we are compelled to do, the relevant inquiry is whether, under the totality of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. *Bostick, supra* at 436. Given the facts of this case, which are amply stated in Judge HOL-BROOK's opinion, I do not understand how our dissenting colleague can possibly suggest a negative answer to this question. The officer's repeated questioning regarding the possession of a weapon, after receiving negative responses to his inquiry, was, in my opinion, coercive. The officer went one step further, however, and directly accused defendant of possessing "something illegal." The officer then asked defendant to "be honest" and tell him what was in the bag. Under the totality of the circumstances, I do not believe that even a wrongfully accused innocent person would have felt free to terminate the encounter.[1]

TAYLOR, J. *(dissenting).* I respectfully dissent from the opinions of the majority in this matter.

---

[1] Indeed, I believe this case is distinguishable from the typical case where an individual is not personally accused of criminal activity but is, solely by virtue of his location, subject to police interrogation.

The majority concludes that the defendant's liberty was sufficiently restrained to implicate his Fourth Amendment rights. I feel that the majority misapprehends the current constitutional standard and mischaracterizes the police conduct at issue.

This matter is controlled by federal law. *People v Faucett*, 442 Mich 153, 157-158; 499 NW2d 764 (1993). In *Florida v Bostick*, 501 US 429, 439; 111 S Ct 2382; 115 L Ed 2d 389 (1991), the United States Supreme Court stated:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

It cannot be overemphasized that "the 'reasonable person' test presupposes an *innocent* person." *Id.* at 438 (emphasis in original). Furthermore, "no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437.

In applying this standard, the majority emphasizes that "the detective failed to advise the defendant that he had the right to refuse consent." *Ante* at 244. No such advice is constitutionally required:

> While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the

response. [*Immigration & Naturalization Service v Delgado,* 466 US 210, 216; 104 S Ct 1758; 80 L Ed 2d 247 (1984).]

The determination of the voluntariness of a defendant's consent does not

> turn[] on the presence or absence of a single controlling criterion; each [case requires] . . . a careful scrutiny of all the surrounding circumstances. . . .
> [K]nowledge of the right to refuse consent is one factor to be taken into account, [but] the government need not establish such knowledge as the sine qua non of an effective consent. [*Schneckloth v Bustamonte,* 412 US 218, 226-227; 93 S Ct 2041; 36 L Ed 2d 854 (1973).]

The majority concludes that the "repetitive, potentially incriminating questions undoubtedly would lead a reasonable person to believe that he was less able to terminate the encounter." *Ante* at 244. In fact, the right of

> police officers [to] approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions . . . is by no means novel; it has been endorsed by the Court any number of times. *Terry, Royer, Rodriguez,* and *Delgado*[1] are just a few examples. [*Bostick, supra* at 401.]

Furthermore, the detective's questioning was not objectionably repetitive.

When he approached the defendant, the detective was dressed in casual clothes and his weapon

---

[1] *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968); *Florida v Royer,* 460 US 491; 103 S Ct 1319; 75 L Ed 2d 229 (1983); *Florida v Rodriguez,* 469 US 1; 105 S Ct 308; 83 L Ed 2d 165 (1984); *Immigration & Naturalization Service v Delgado,* 466 US 210; 104 S Ct 1758; 80 L Ed 2d 247 (1984).

was not visibly displayed. He immediately identified himself to the defendant as a police officer, showing him his picture identification and badge. He first asked the defendant if he could speak with him. He then asked the defendant if he was carrying any weapons, and the defendant said he was not. At the same time, the detective noticed that the defendant's hands were shaking, his feet were tapping on the ground, he could not sit still in his seat, he seemed almost on the brink of crying, and he appeared to be concealing something with his hand in the duffle bag on the seat next to him. Because of this furtive behavior, the detective again asked the defendant if he had any weapons, and again the defendant said no. The detective then asked if he could look in the defendant's bag. The defendant replied that he did not see the reason for the detective's request, and the detective told him the reason: that he felt the defendant had something illegal in the bag and that the defendant should be honest with him. The defendant then stated that he had a weapon in the bag, specifically, a gun.

In *Bostick,* two police officers in full uniform, and one of them holding a zipper pouch clearly containing a pistol, approached a passenger on a bus. In this case, there was only one police officer, he was dressed in casual clothes, and his pistol was not visible. It is true that, unlike in *Bostick,* the defendant was not specifically advised that he had the right to refuse consent. However, as discussed above, this is not required. The majority relies on the assertion that "the detective was standing over the defendant and between the defendant and the bus door." *Ante* at 244. The detective's testimony, however, was that he was standing next to the seat in front of the defendant. He was not directly alongside the defendant's seat,

blocking access to the aisle. More importantly, as the *Bostick* Court specifically noted and the majority in the instant case concedes, the restriction of a passenger's freedom of movement on a bus is not the product of police conduct; it is merely an inherent consequence of being a passenger on a bus. *Id.* at 435-436.

The majority relies on two federal appellate cases to support its interpretation of *Bostick.* Both cases are factually dissimilar from the case at bar and, in fact, evidence by comparison how unobtrusive the detective's conduct was. In *United States v Wilson,* 953 F2d 116 (CA 4, 1991), the defendant allowed a police officer, who was accompanied by two other police officers, to search his person and his carry-on bag in an airport terminal. The defendant, however, refused permission to search two coats he was carrying and began to walk away. The police officer walked alongside the defendant and persisted in asking to be allowed to search the coats. The defendant replied in an angry tone that he was being harassed and continued to refuse permission to search the coats. When asked if he would accompany the police officers to the police station so that a drug-sniffing dog could examine the coats, the defendant said no and again proceeded toward the exit. The police officer continued to walk alongside the defendant and asked if he could just pat down the coats. Two of the police officers persisted in asking the same question even after the defendant had left the building and, ultimately, the defendant agreed to allow them to search the coats. Crack cocaine was found in the pocket of one of the coats and the defendant was arrested after a chase. *Id.* at 118-120. The district court denied the defendant's motion to suppress the evidence, concluding that "a stop or seizure had occurred, but that it was founded on 'reason-

able suspicion or probable cause.'" *Id.* at 120. Citing *Bostick,* the Fourth Circuit Court of Appeals concluded that the defendant was seized within the meaning of the Fourth Amendment:

> The officer's prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment. [*Wilson, supra* at 123].

The court relied on the following facts: that the defendant continuously said that the police were stopping him and harassing him; that the defendant refused the officer's requests in an angry tone and on numerous occasions was asked by the officers to lower his voice; and, most importantly, that the police persisted with the same questions even after the defendant attempted to terminate the encounter on at least four occasions. *Id.* The court also distinguished its case from "a case heavily relied upon by the government" in which "there was no effort whatsoever by the suspect to terminate the police-initiated encounter." *Id.* at 123, n 2.

In the other case relied on by the majority, *United States v Bloom,* 975 F2d 1447 (CA 10, 1992), two police officers, one in uniform and visibly armed, the other in plainclothes with his weapon concealed, questioned the defendant from the hallway outside his small private train compartment. The officers examined the defendant's ticket and identification and asked him if he had any drugs in his luggage. The defendant stated that he did not. When asked if he would voluntarily consent to a search of his luggage, the defendant said no, stating that his mother's remains, which he was transporting for burial, were inside.

Subsequently, one of the police officers questioned a train attendant, who confirmed that the defendant had told him to be very careful with his luggage because his mother's remains were inside. The officer then made inquiries at the ticket office and the defendant's story was again corroborated. Despite this, the officers returned to the defendant's compartment and questioned him again. After eliciting a discrepancy in the defendant's story, one of the officers seized the defendant's suitcases over his objection. The results of a canine sniff indicated the presence of contraband, the defendant was arrested, and, after a warrant was obtained, a search of the luggage uncovered marijuana. *Id.* at 1449. The district court denied the defendant's motion to suppress the evidence, concluding that the defendant had not been seized and that he voluntarily had provided the information requested by the police officers. In reversing the decision of the district court, the Tenth Circuit Court of Appeals held that "the location of the encounter in the confines of a small private train compartment" was a "critical factor [that] weighed heavily in our analysis." *Id.* at 1453. The court specifically noted that a person traveling in a private train compartment has a higher expectation of privacy than an individual traveling in a public passenger car of the train. *Id.* at 1453, n 6. The court also distinguished a private train compartment from the public passenger section of a bus, the location of the encounter in *Bostick. Bloom, supra* at 1453-1454, n 7. The court cited two other factors in support of its conclusion that the defendant had been seized: there were two police officers, and one of them was in uniform and visibly armed. *Id.* at 1454. Finally, the court acknowledged that "[t]he Supreme Court has recognized that the failure to [advise a defendant that

he is free to terminate the encounter] does not necessarily eliminate the consensual nature of the encounter." *Id.* at 1454-1455. "Nonetheless, [the court] afforded this factor 'greater weight' . . . because the encounter occurred in a nonpublic setting." *Id.* at 1455.

In the case at bar, unlike in *Wilson,* the defendant did not refuse numerous requests, did not accuse the detective of harassing him, and made no effort to terminate the encounter. And, unlike in *Bloom,* the defendant did not expressly deny the detective's request to look in his bag; his response to the request, that he did not see any reason for it, actually indicates that the defendant understood that he was free to refuse the request. Furthermore, far from expressing an unequivocal desire to terminate the encounter, the defendant's response actually invited the response from the detective.

The circumstances of this encounter would not have led a reasonable innocent person to believe he was not free to decline the detective's request or otherwise terminate the encounter. More significantly, this particular defendant does not appear to have so believed. The detective's conduct was not the type of conduct that is proscribed by the Fourth Amendment.

The concurrence's evocation of notoriously repressive regimes is emotionally compelling but analytically impotent. References to dragnet-style sweeps by groups of police officers and " 'other days, under other flags, when no man traveled his nation's roads or railways without fear of unwarranted interruption' " are wholly impertinent, given the actual facts of this case. Such bombast does little to assist in the serious analysis required here.

Obviously, the case law dealing with encounters

between the police and citizens, with its fact-inten-
sive analytical framework, does not provide me-
chanically applicable rules to be administered by
lower courts. That very fact, however, makes it all
the more important to heed the underlying bal-
ance of policy considerations articulated in *Bos-
tick, supra* at 439:

> If that war [i.e., the war on drugs] is to be
> fought, those who fight it must respect the rights
> of individuals, whether or not those individuals
> are suspected of having committed a crime. By the
> same token, this Court is not empowered to forbid
> law enforcement practices simply because it con-
> siders them distasteful. The Fourth Amendment
> proscribes unreasonable searches and seizures; it
> does not proscribe voluntary cooperation.

In the instant case, the circuit court clearly
erred in granting the defendant's motion to sup-
press the evidence. The defendant was not seized
within the meaning of the Fourth Amendment. I
would reverse the circuit court's order and allow
the evidence to be used at trial.