*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARCHIE SOVA,

        Defendant-Appellant.

UNPUBLISHED
April 10, 2026
10:58 AM

No. 375595
Ingham Circuit Court
LC No. 25-000105-FH

Before: GADOLA, C.J., and BOONSTRA and PATEL, JJ.

PER CURIAM.

Defendant was pulled over in an empty parking lot when he was confronted by a police officer. Approximately two minutes after the officer's initial contact with defendant, the officer requested a drug-sniffing dog. A search of defendant's vehicle yielded methamphetamine. Defendant moved to suppress the introduction of that evidence. The trial court denied defendant's motion. Defendant appeals by leave granted.[1] Based on the totality of the facts and circumstances, we conclude that the officer lacked a reasonable, articulable suspicion of criminal activity that justified prolonging the traffic stop and thus defendant's Fourth Amendment rights were violated. Accordingly, we reverse the trial court's denial of defendant's motion to suppress and remand for further proceedings consistent with this opinion.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In the early morning hours of December 15, 2024, Ingham County Sheriff's Deputy Joseph Pintar was on patrol when he observed a vehicle driven by defendant pull into an empty drug store parking lot during a freezing rainstorm. Deputy Pintar noticed that the vehicle "appeared to be in bad shape." Deputy Pintar pulled into the parking lot and approached defendant's vehicle. He observed that the vehicle was missing its front bumper and had extensive damage to the windshield, to the point that Deputy Pintar believed that it was unsafe to operate on

---

[1] *People v Archie Sova*, unpublished order of the Court of Appeals, entered August 22, 2025 (Docket No. 375595).

a public roadway. Defendant was standing outside of the vehicle, with the driver's side door open. Upon approaching the vehicle, Deputy Pintar observed defendant reach inside the vehicle. Deputy Pintar told defendant to "keep [his] hand out of the car." Deputy Pintar testified that defendant's actions presented an "officer safety concern" because defendant could have been reaching for, or trying to conceal, a weapon. Deputy Pintar maintained defendant "appeared nervous" when he first approached him. Deputy Pintar asked defendant for his driver's license, recognized defendant's name, and recalled that defendant had an "established history of possession of a stolen vehicle as well as possession of methamphetamine." Deputy Pintar called for a canine unit to come to the scene to conduct a drug sniff on defendant's vehicle.

After Deputy Pintar called for a canine unit, he entered defendant's driver's license number and vehicle identification number into the police computer system and found that defendant's vehicle was uninsured. He then questioned defendant about where he was going, whether the vehicle was insured, and other topics related to the vehicle. An officer arrived with a drug dog approximately 14 minutes after Deputy Pintar called for them. About 16 minutes elapsed from the time Deputy Pintar first made contact with defendant to the canine unit's arrival. The drug dog alerted to the presence of drugs. Deputy Pintar and another deputy searched the vehicle and found methamphetamine.

Defendant was charged with methamphetamine possession, MCL 333.7403(2)(b)(*i*). Before trial, defendant moved to suppress the methamphetamine, arguing that his Fourth Amendment rights had been violated and that the evidence found during the search of his vehicle was therefore inadmissible. The trial court denied the motion, finding that Deputy Pintar had an independent reasonable suspicion to justify calling for a drug-sniffing dog. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo a trial court's determination regarding whether a defendant's Fourth Amendment rights were violated. *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2020). "Findings of fact made after a suppression hearing are reviewed for clear error, while the ultimate decision on a motion to suppress is reviewed de novo." *People v Vaughn*, 344 Mich App 539, 549; 1 NW3d 414 (2022). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake." *Id*. (cleaned up).

## III. ANALYSIS

Defendant argues that his Fourth Amendment rights were violated when Deputy Pintar impermissibly prolonged the investigative seizure by calling for a drug-sniffing dog without a reasonable suspicion that defendant possessed contraband. We agree.

"Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Pagano*, 507 Mich 26, 31-32; 967 NW2d 590 (2021), citing US Const, Am IV, and Const 1963, art 1, § 11. Under the exclusionary rule, evidence obtained in violation of a defendant's Fourth Amendment rights is generally inadmissible in criminal proceedings against him. *People v Goldston*, 470 Mich 523, 528; 682 NW2d 479 (2004).

The parties dispute whether, and at what point, defendant was "seized" under the Fourth Amendment. "A person has been seized within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *People v Duff*, 514 Mich 617, 631; 22 NW3d 476 (2024) (cleaned up). This totality-of-the-circumstances test "is an objective standard that is focused on a reasonable person's interpretation of police conduct." *Id*. "In situations where a person might not wish to leave because of reasons independent of police actions," the test focuses on "whether a reasonable person would have felt free to decline an officer's requests or to otherwise terminate the police encounter." *Id*. Further, a person is seized when "the police officers ask[] him to leave his automobile and to produce identification." *People v Freeman*, 413 Mich 492, 494-495; 320 NW2d 878 (1982).

In this case, the totality of the circumstances show that defendant was seized before Deputy Pintar called for the canine unit. Deputy Pintar approached defendant in an empty parking lot after midnight, and "[a] reasonable person is less likely to feel free to leave when they are the sole focus of law enforcement attention in an isolated area after dark." *Duff*, 514 Mich at 636. Further, Deputy Pintar commanded defendant to stop reaching in his vehicle and told defendant to produce his identification; after defendant did so, another officer guided defendant away from his vehicle while continuing to question him. A reasonable person in defendant's situation would not have felt free to ignore the police commands and leave. *Freeman*, 413 Mich at 494-495. Accordingly, defendant was seized for purposes of the Fourth Amendment.

We must therefore consider whether the seizure was reasonable for Fourth Amendment purposes. "A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot." *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005). Whether there is a reasonable suspicion to make an investigative stop is "determined case by case, on the basis of an analysis of the totality of the facts and circumstances," and "must be based on commonsense judgments and inferences about human behavior." *Id*. (cleaned up). "Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996).

Deputy Pintar testified that defendant's vehicle had extensive damage, and it was of particular concern that "the windshield was completely cracked and shattered through . . . to the point [that he] felt like it would not be safe to operate on the roadway." At that point, Deputy Pintar had probable cause to believe that a traffic violation had occurred because defendant had been driving a vehicle that did not appear safe to operate. "[W]hen there is probable cause to believe that a driver has violated a traffic law, it is constitutional to briefly detain the driver for purposes of addressing the violation." *People v Kavanaugh*, 320 Mich App 293, 299; 907 NW2d 845 (2017). Deputy Pintar was therefore justified in seizing defendant to address a possible traffic violation.

However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v United States*, 575 US 348, 350; 135 S Ct 1609; 191 L Ed 2d 492 (2015). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id*. at 350-

351 (alteration in original), quoting *Illinois v Caballes*, 543 US 405, 407; 125 S Ct 834; 160 L Ed 2d 842 (2005).

During an otherwise lawful traffic stop, an officer "may conduct certain unrelated checks . . . [b]ut he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriquez*, 575 US at 355. An officer's mission during a traffic stop includes determining whether to issue a traffic ticket and other inquiries related to the traffic stop such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. "A dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing" and "is not fairly characterized as part of the officer's traffic mission." *Id*. at 355-356 (cleaned up). "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs— i.e., adds time to—the stop." *Id*. at 357 (cleaned up). "Once the constitutionally sound basis for the traffic stop has been addressed, any further extension of the detention in order to conduct '[o]n-scene investigation into other crimes' or for any other reason is a Fourth Amendment violation unless new facts come to light during the traffic stop that give rise to reasonable suspicion of criminal activity." *Kavanaugh*, 320 Mich App at 301, quoting *Rodriguez*, 575 US at 356 (footnote omitted, alternation in original).

Deputy Pintar's initial questioning of defendant was within the scope of the mission of the stop—he asked defendant about the vehicle and why he was stopped in the parking lot. Eventually, Deputy Pintar asked defendant for his driver's license, which defendant gave to him. Less than 45 seconds after identifying defendant and having him move away from the car, Deputy Pintar requested a canine unit. Deputy Pintar's request for a canine unit was made approximately two minutes after his initial contact with defendant. When Deputy Pintar requested the canine unit, he had not run defendant's driver's license, determined whether there were outstanding warrants against defendant, or verified the automobile's registration or insurance. Approximately 16 minutes after the initial contact, the dog sniff was completed.

Deputy Pintar testified that he had prior contacts with defendant and was personally familiar with him, including defendant's "established history of possession of a stolen vehicle as well as possession of methamphetamine." While Deputy Pintar did not initially recognize defendant, he stated, "It's when I got that driver's license within probably the first minute of contact. That is when I realized his identity." Deputy Pintar stated in his report, "Due to prior knowledge of [defendant], I requested Sergeant Macomber to respond with his K-9." Deputy Pintar reiterated this fact in his testimony: "So to make it clear, the reason why I called for a drug dog was the previous knowledge of recent possession of felony drugs." During the approximately 14-minute wait for the canine unit, Deputy Pintar did not take any steps toward writing a citation, calling for a tow, or anything else to have accomplished the mission of the stop.

When Deputy Pintar called for a canine unit, the detention became focused on defendant's potential possession of illegal drugs. The canine request was "not fairly characterized as part of the officer's traffic mission." *Rodriquez*, 575 US at 355-356 (cleaned up). Rather, the canine request facilitated the drug investigation. This detour from the mission of the stop required independent reasonable suspicion. *Id*. at 355. The reasonable suspicion sufficient to detain an individual "entails something more than an inchoate or unparticularized suspicion or 'hunch,' but

less than the level of suspicion required for probable cause." *Champion*, 452 Mich at 98, citing *United States v Sokolow*, 490 US 1; 109 S Ct 1581; 104 L Ed 2d 1 (1989). In assessing reasonable suspicion, courts must examine the totality of the circumstances to determine whether an officer had "an objectively reasonable particularized suspicion that the specific individual being stopped is engaged in wrongdoing." *People v Prude*, 513 Mich 377, 387; 15 NW3d 249 (2024).

Deputy Pintar documented in his report and testified that he requested the canine unit on the basis of his knowledge of defendant's criminal history. He made that decision less than two minutes after his initial contact with defendant. A defendant's criminal history is insufficient independent reasonable suspicion to support prolonging a traffic stop. See *Joshua v DeWitt*, 341 F3d 430, 446 (CA 6, 2003) (holding that an officer's knowledge that a defendant has a criminal history is not enough to create reasonable suspicion that criminal activity is currently afoot, even when combined with other weaker indicators such as nervousness and illogical travel plans).

The trial court concluded that Deputy Pintar had reasonable suspicion based "on the condition of the vehicle, the behavior and nervousness and continued reaching into the vehicle of Defendant." The condition of the vehicle was the basis for the initial stop and did not provide support for any reasonable suspicion of criminal activity. Rather, Deputy Pintar testified that he was concerned that the vehicle was not safe to operate on the roadway because of its condition. While Deputy Pintar testified that defendant "appeared nervous" when the deputy first approached him, the video-audio recording of the encounter does not reveal any observable signs of nervousness. Defendant answered Deputy's Pintar's questions and readily produced his identification. It took time for defendant to form his responses and his speech was impaired, but these deficits can be attributed to his previous stroke.[2] Moreover, as this Court has recognized, "many courts have given little weight to considerations of nervousness during a traffic stop" in determining whether reasonable suspicion exists. *Kavanaugh*, 320 Mich App at 304. See also *People v Bloxson*, 205 Mich App 236, 247; 517 NW2d 563 (1994) ("[N]ervousness alone is insufficient to create a reasonable suspicion of criminal activity."). Deputy Pintar also testified that defendant reached into the driver's side of the vehicle during the initial encounter, which raised a concern that defendant may be attempting to grab for or conceal a weapon. But this concern was quickly dispelled when defendant answered truthfully that he did not have any weapons, a second officer led defendant away from the vehicle, and the driver's side door was shut. Further, Deputy Pintar testified that he requested a canine unit to search for drugs, not guns.

Our Supreme Court has recognized that, "in some circumstances, individual factors that would be insufficient on their own . . . can, in the aggregate, provide reasonable suspicion under the totality of the circumstances." *Prude*, 513 Mich at 392. "However, this is only so if the individual factors "collectively are greater than the sum of their parts, and build to form the requisite objective basis for the particularized suspicion that criminal wrongdoing is afoot[.]" *Id.* at 392-393 (cleaned up). Based on the totality of the facts and circumstances, we conclude that Deputy Pintar lacked a reasonable, articulable suspicion of criminal activity that justified

---

[2] Deputy Pintar testified that he was aware that defendant previously suffered a stroke and, as a result, lacked movement on the right side of his body. It is evident from the video-audio recording of the encounter that defendant was physically impaired, and his right leg was in a brace.

extending the stop to conduct a dog sniff.  Accordingly, the trial court erred by denying defendant's motion to suppress.

Reversed and remanded for further proceedings.  We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Sima G. Patel