**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED FEBRUARY 1, 2005**

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                        No. 125141

SHAWN LEON JENKINS,

Defendant-Appellee.

_____

**PER CURIAM.**

This case requires us to consider when defendant's consensual encounter with a police officer was transformed into an investigatory stop, which gives rise to Fourth Amendment protections and must be supported by reasonable suspicion. Defendant argues that the officer seized him without reasonable suspicion to do so. The trial court agreed, granting defendant's motion to suppress the incriminating evidence later found by the officer and dismissing the pending charges. The Court of Appeals affirmed.

We conclude that defendant was not "seized" within the meaning of the Fourth Amendment until after the totality of the circumstances gave the officer a reasonable suspicion that defendant had been engaged in criminal behavior. Accordingly, the trial court erred when it granted defendant's motion. We reverse the judgment of the Court of Appeals and remand this case to the trial court for reinstatement of the charges brought against defendant and for further proceedings.

## I. BACKGROUND

During the evening of August 23, 2001, the Ann Arbor Police Department received a complaint regarding a party in progress in the common area of a housing complex on North Maple Road. Officers Geoffrey Spickard and Jeff Lind were dispatched to the housing complex, which was known to the police as a high crime and drug area. Upon their arrival, they found a gathering of fifteen to twenty people drinking and talking loudly. Defendant and another man were seated on stairs leading to one of the housing units.

Officer Spickard approached defendant, and the two engaged in a general conversation about the party. At that point, a woman emerged from the attached housing unit and, using profane language, asked defendant who he was and why he was seated on her porch. After hearing this, Officer Spickard asked defendant if he lived in the housing

2

complex. Defendant said that he did not, and Officer Spickard asked to see defendant's identification. When defendant handed over his state identification card, Officer Spickard pulled out his personal radio and started to place a call to the Law Enforcement Information Network (LEIN).

Defendant's behavior immediately changed.[1] He became obviously nervous and made furtive gestures toward a large pocket on the side of his pants. He began to walk away, despite the fact that Officer Spickard still held his identification card and was speaking to him.[2] Several residents of the housing complex called out invitations for defendant to enter their homes.

---

[1] The dissent fails to note these changes in defendant's behavior. *Post* at 5-6. The dissent may view these facts as irrelevant but, when the governing Fourth Amendment principles are correctly applied, these changes in defendant's behavior support the officers' ultimate decision to seize the defendant.

[2] This fact is also omitted from the dissent's analysis. Thus, while the dissent concludes that no reasonable person would walk away under the circumstances, *post* at 8, this view was obviously not shared by the defendant, who walked away "under those circumstances."

That Justice CAVANAGH finds our reference to the record "enigmatic[]" and "befuddl[ing]," *post* at 9 n 10, demonstrates the dissent's belief that we are entitled to rewrite the events underlying this appeal with an unrealistic legal formalism. It is only with a lawyer's armchair detachment that the dissent can hypothesize about what a "reasonable person" would do while ignoring the actions of the individual who *actually* observed the officers' conduct and whose liberty was *actually* at stake.

At that point, Officer Spickard and his partner walked alongside defendant, encouraging him to wait for the results of the LEIN inquiry. When defendant did not stop, Officer Spickard placed a hand on defendant's back and told him that he was not free to leave.

The LEIN inquiry revealed an outstanding warrant for defendant's arrest. As Officer Spickard was placing defendant in handcuffs, a gun fell from defendant's waistband to the ground.

## II. PROCEDURAL HISTORY

Defendant was charged with carrying a concealed weapon, MCL 750.227; possession of a firearm by a felon, MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He moved to suppress the evidence on Fourth Amendment grounds and sought dismissal of the charges.

The trial court held an evidentiary hearing at which both Officer Spickard and defendant testified. The trial court considered Officer Spickard's testimony and determined that, for purposes of the Fourth Amendment, defendant was "seized" when he was asked for identification. In reaching this conclusion, the trial court relied on Officer Spickard's testimony that he believed that defendant was not free to leave at that point. The trial court concluded that the officer did not

4

have a reasonable suspicion to support such an investigative stop. It granted defendant's motion to suppress evidence and dismissed the case.

A divided Court of Appeals panel affirmed.[3] The majority agreed with the trial court that Officer Spickard seized defendant when he asked defendant for identification.[4] It concluded that the seizure was not supported by a reasonable suspicion because defendant was seated in a public area, was not engaged in the conduct for which the officers were summoned, and "forthrightly" answered the officer's questions. As a result, the majority held that defendant's Fourth Amendment rights were violated and that the trial court properly granted defendant's motion to suppress the evidence.

The dissenting judge, on the other hand, determined that the initial encounter, including Officer Spickard's request for defendant's identification, did not constitute an investigatory stop. The dissent further concluded that subsequent events gave rise to a reasonable suspicion of possible criminal activity and entitled Officer Spickard to transform the encounter into an investigatory stop.

---

[3] Unpublished opinion per curiam, issued November 18, 2003 (Docket No. 240947).

[4] The majority criticized the trial court's reliance on Officer Spickard's subjective belief that defendant was not free to leave once he had been asked to produce identification, but concluded that there was objective evidence as well to support this conclusion. We disagree.

5

The prosecutor seeks leave to appeal in this Court. After hearing oral argument from both parties on the prosecution's application for leave to appeal, we have determined that the judgment of the Court of Appeals must be reversed and that this matter must be remanded to the trial court for reinstatement of the charges against defendant and further proceedings.

### III. STANDARD OF REVIEW

This Court reviews a trial court's factual findings in a suppression hearing for clear error. *People v Custer*, 465 Mich 319, 325-326; 630 NW2d 870 (2001). But the "[a]pplication of constitutional standards by the trial court is not entitled to the same deference as factual findings." *People v Nelson*, 443 Mich 626, 631 n 7; 505 NW2d 266 (1993). Application of the exclusionary rule to a Fourth Amendment violation is a question of law that is reviewed de novo. *Custer, supra* at 326.

### IV. ANALYSIS

The United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11.[5]

Under certain circumstances, a police officer may approach and temporarily detain a person for the purpose of

---

[5] Cf. *Harvey v Michigan*, 469 Mich 1, 6 n 3; 664 NW2d 767 (2003).

6

investigating possible criminal behavior even though there is no probable cause to support an arrest. *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968). A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot. *Custer*, *supra* at 327; *People v Oliver*, 464 Mich 184, 192; 627 NW2d 297 (2001); *Terry*, *supra* at 30-31. Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances. *Oliver*, *supra* at 192. A determination regarding whether a reasonable suspicion exists "'must be based on commonsense judgments and inferences about human behavior.'" *Id*. at 197 (citation omitted).

Of course, not every encounter between a police officer and a citizen requires this level of constitutional justification. A "seizure" within the meaning of the Fourth Amendment occurs only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave.[6] *People v Mamon*, 435 Mich 1, 11;

---

[6] Justice CAVANAGH recognizes that this inquiry is an objective one, but asserts that "an officer's subjective intent *is* relevant to the extent that it may have been conveyed to the defendant by the words or actions of the officers." *Post* at 8. Justice CAVANAGH relies on a proposition that secured only two votes in *United States v Mendenhall,* 446 US 544, 554 n 6; 100 S Ct 1870; 64 L Ed 2d

7

457 NW2d 623 (1990). When an officer approaches a person and seeks voluntary cooperation through noncoercive questioning, there is no restraint on that person's liberty, and the person is not seized. *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983) (plurality opinion).

Here, Officer Spickard's initial encounter with defendant was consensual. Officer Spickard did not seize defendant when he asked whether defendant lived in the housing complex, nor did he seize defendant when he asked for identification. No evidence indicated that Officer Spickard told defendant at this juncture to remain where he was or that defendant was required to answer the officer's questions.

Asking such questions to elicit voluntary information from private citizens is an essential part of police investigations. *Hiibel v Sixth Judicial Dist Court of*

---

497 (1980). Also, he appears to misunderstand the meaning of this passage. *Mendenhall* simply recognizes that an officer's subjective intent may be relevant if it is *objectively* manifested. In other words, it restates the principle that only *objective* conduct and circumstances are relevant for Fourth Amendment purposes.

The dissent errs, therefore, by asserting that Officer Spickard's subjective beliefs are relevant without determining whether those subjective beliefs were, in fact, objectively manifested. Instead, the dissent "presume[s]" that the officer's beliefs were apparent to defendant. *Post at* 10. Assuming arguendo that we are entitled to insert our presumptions into the record, Justice CAVANAGH's presumption is disproved by the fact that defendant *himself* walked away from the officers during the LEIN check.

8

*Nevada*, 542 US __; 124 S Ct 2451; 159 L Ed 2d 292 (2004). "In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." 542 US ___; 124 S Ct 2458; 159 L Ed 2d 302; see also *Royer, supra* at 501. As the United States Supreme Court has recognized, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Immigration & Naturalization Service v Delgado*, 466 US 210, 216; 104 S Ct 1758; 80 L Ed 2d 247 (1984).

This summary of governing Fourth Amendment principles demonstrates that the Court of Appeals majority erred when it analyzed the initial conversation between Officer Spickard and defendant, and Officer Spickard's request for identification, as if the protections of the Fourth Amendment were implicated. The Fourth Amendment was not implicated until Officer Spickard actually hindered defendant's attempt to leave the scene, thereby "seizing" him within the meaning of the Fourth Amendment. Specifically, this "seizure" occurred when Officer Spickard followed defendant as he tried to walk away, orally discouraged him from leaving, and, finally, put a hand on his back and told him to wait for the results of the LEIN inquiry. This point—when Officer Spickard physically

hindered defendant's departure and instructed him to stay in the officer's presence—is the earliest at which a reasonable person might have concluded that he was not free to leave.

By this point, however, Officer Spickard had a reasonable suspicion to make an investigatory stop. First, the officer knew that a female resident had challenged defendant's unconsented-to presence on her front porch. Second, when defendant saw that Officer Spickard was initiating a LEIN inquiry, he immediately began to act nervously and reached toward his pocket.[7] Third, defendant attempted to walk away from the officer, apparently so intent on leaving that he was willing to lose possession of his identification card.[8] Fourth, although defendant did not live in the area, various people invited him into their homes, offering him protection from further police questioning.[9] Considering the totality of these

---

[7] This Court and the United States Supreme Court agree that "'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'" *Oliver*, *supra* at 197, quoting *Illinois v Wardlow*, 528 US 119, 124; 120 S Ct 673; 145 L Ed 2d 570 (2000).

[8] Presence in a high crime area coupled with unprovoked flight can also give rise to a reasonable suspicion to support an investigatory stop. *Oliver*, *supra* at 197.

[9] An experienced officer could infer that these bystanders had reason to know that defendant desired to avoid further police scrutiny. This inference adds to the quantum of evidence supporting the conclusion that Officer Spickard had reasonable suspicion to detain defendant.

10

circumstances, Officer Spickard had a reasonable suspicion sufficient to warrant transforming the consensual encounter into an investigatory stop and briefly detaining defendant until the LEIN inquiry could be completed.

## V. CONCLUSION

The Court of Appeals erred when it affirmed the trial court's conclusion that defendant's Fourth Amendment rights were violated and that the incriminating evidence produced by the investigative stop in this case should be suppressed. We reverse the judgment of the Court of Appeals and remand this case to the trial court for reinstatement of the charges against defendant and for further proceedings consistent with this opinion.

Clifford W. Taylor
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

11

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                      No. 125141

SHAWN LEON JENKINS,

    Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

Despite recognizing that a police officer must have a reasonably articulable suspicion that criminal activity is afoot before detaining a person, today's majority incorrectly identifies the point at which defendant was seized to justify a detention based on suspicions formed after the detention occurred. Because defendant was seized without reasonable suspicion, and because the Fourth Amendment expressly prohibits using after-acquired suspicions to justify a seizure, *Florida v JL*, 529 US 266, 271-272; 120 S Ct 1375; 146 L Ed 2d 254 (2000), I respectfully dissent.

The Search and Seizure Clause of both the United States Constitution and the Michigan Constitution[1] protects

---

[1] US Const, Am IV; Const 1963, art 1, § 11.

individuals against unreasonable searches and seizures conducted by governmental actors. *Whren v United States*, 517 US 806, 809-810; 116 S Ct 1769; 135 L Ed 2d 89 (1996); *People v Shabaz*, 424 Mich 42, 52; 378 NW2d 451 (1985). Before detaining an individual, a police officer must have a particularized and objective basis for suspecting criminal activity by the particular person detained. *Shabas, supra* at 59. An "inchoate and unparticularized suspicion or 'hunch'" is an insufficient basis for seizing a person. *Terry v Ohio*, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Rather, the officer must have at least "a particularized suspicion, based on an objective observation, that the person stopped has been, is, or is about to be engaged in criminal wrongdoing." *Shabaz, supra* at 59. "As long as the person to whom questions are put remains free to disregard the questions and walk away," there has been no Fourth Amendment violation. *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980). But at the moment that person is restrained, he is seized. *Terry, supra* at 16.

Generally, "'a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"

*California v Hodari D*, 499 US 621, 627-628; 111 S Ct 1547; 113 L Ed 2d 690 (1991), quoting *Mendenhall*, *supra* at 554. Where a seizure by show of authority is alleged, rather than a seizure by physical force, the test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D*, *supra* at 628.

Interestingly, the majority concludes that defendant was not seized until the officers *physically* restrained defendant after he tried to walk away. But the majority ignores that a seizure can also occur by a police officer's show of authority. The majority states, "When an officer approaches a person and seeks voluntary cooperation through noncoercive questioning, there is no restraint on that person's liberty, and the person is not seized." *Ante* at 8-9, citing *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983). I agree that the initial questioning and the officers' request to see defendant's identification were part of a consensual citizen-police encounter. But the majority fails to address the next

critical event—the LEIN[2] check—and instead jumps to events that occurred while the LEIN check was in progress.

On the evening in question, Officer Geoffrey Spickard and his partner responded to an Ann Arbor housing complex after receiving a complaint about a large group of people drinking and being loud in the complex's courtyard. When the officers arrived, they observed fifteen to twenty people engaged in those activities. Nonetheless, they bypassed those people and approached defendant and another gentleman who were sitting quietly on some steps and who were not drinking. According to Officer Spickard's preliminary examination testimony, he approached these particular two gentlemen because he did not recognize them. At the suppression hearing, however, he testified that he approached them because he believed defendant's companion resided at the apartment connected to the steps on which he was sitting, and the officer wanted to ask him some questions about the gathering. Officer Spickard testified that while he was talking to the gentlemen, a woman opened the adjacent door, asked defendant who he was and why he was on her porch, and retreated inside.

---

[2] Law Enforcement Information Network.

4

Thus, according to Officer Spickard, he initially asked for defendant's identification because he suspected that defendant might not belong at the complex, and he wanted to determine where defendant lived. Defendant voluntarily informed him that he did not live in the complex, and he voluntarily gave him his facially valid identification card. At that point, any suspicions the officers had about where defendant lived were resolved, and there was no need to detain defendant.[3] Of course, the officers were free to continue the consensual encounter by asking defendant additional questions, such as why he was there, but, instead, they confiscated the identification card and, without requesting permission, initiated a LEIN check.[4]

---

[3] The majority apparently does not contest that there was no need to detain defendant because it does not find that the officers had reasonable suspicion to detain defendant at the time of the LEIN check. See *ante* at 10. And at the suppression hearing, Officer Spickard offered no rationale whatsoever that would indicate that he or his partner had a reasonable suspicion that any other sort of criminal activity was afoot.

[4] The majority claims that I "fail[] to note" changes in defendant's behavior that occurred after the officers began the LEIN check, and that I thus erroneously fail to properly assess the facts supporting reasonable suspicion. *Ante* at 3 n 1. Apparently, the majority misses my point that at the time those subsequent behaviors occurred, defendant had already been seized. Thus, not only do those behaviors add nothing to the analysis whether the officers

5

The LEIN check in this case was not only nonconsensual, but it was more than a momentary detention.[5] A person "'may not be detained even momentarily without reasonable, objective grounds for doing so . . . .'" *Shabaz*, *supra* at 57, quoting *Royer*, *supra* at 498. When the trespass theory is discounted, as it should be,[6] even the majority can find no facts that support a finding that the

had reasonable suspicion at the time of the seizure, but considering subsequent behavior violates the United States Supreme Court's clear prohibition on using after-acquired suspicions in a totality of the circumstances analysis. See *Florida v JL, supra* at 271-272.

[5] In fact, in this case, the wait for the LEIN check results was unusually long because the police dispatcher was busy.

[6] MCL 750.552, in relevant part, defines trespass as follows:

> Any person who shall wilfully enter, upon the lands or premises of another without lawful authority, after having been forbidden so to do by the owner or occupant, agent or servant of the owner or occupant, or any person being upon the land or premises of another, upon being notified to depart therefrom by the owner or occupant, the agent or servant of either, who without lawful authority neglects or refuses to depart therefrom, shall be guilty of a misdemeanor . . . .

Of course, a LEIN check would not assist the officers in determining whether the putative occupant had previously asked defendant to leave, and the officers had not seen the putative occupant ask defendant to leave. Thus, any alleged suspicion of trespass was unrelated to the LEIN check and the subsequent detention.

officers had reasonable suspicion of criminal activity when the LEIN check was initiated.[7]

The situation that occurs when an officer asks for identification and a person produces it involves a question and a response, an exchange that can be fairly characterized as a "consensual encounter" as that term is used in Fourth Amendment context. But here the officers' next action did not involve a question to which defendant had the opportunity to choose to respond. The exchange had ceased. By confiscating defendant's identification card and beginning an investigation, the officers turned the otherwise voluntary encounter into a detention. By skirting that issue entirely, the majority fails to correctly identify the point at which defendant was seized.

Using the objective test set forth in *Hodari D*, *supra* at 628, the focus must be on whether, when the LEIN check began, "the officer's words and actions would have

---

[7] The officers would find out later that defendant was there visiting his two daughters, who did live in the complex. While that fact has no direct bearing on this analysis, Officer Spickard claimed that he continued speaking with defendant because he suspected him of trespassing. But the fact that the officers did not elicit this information from defendant, which could have been obtained by asking the simple question, "Why are you here?", but instead chose to run a LEIN check, which would not answer the question, supports defendant's theory that the officers were acting on inchoate suspicions unrelated to trespass.

conveyed" to a reasonable person that he was being seized. "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are some circumstances that suggest that a seizure has occurred. *Mendenhall*, *supra* at 554.

Here, two uniformed, armed police officers, who had already resolved their initial concern about defendant's residence, nonetheless retained defendant's identification card and initiated a LEIN check with no particularized, articulable basis for doing so.[8] The officers' actions would have objectively conveyed to a reasonable person that the person was not free to leave, and I cannot conceive of a reasonable person who would feel free to walk away under

---

[8] This particular situation differs from those in which our courts have considered LEIN checks run in the course of lawful vehicle stops. See, e.g., *People v Davis*, 250 Mich App 357, 367-368; 649 NW2d 94 (2002), and *People v Walker*, 58 Mich App 519, 523-524; 228 NW2d 443 (1975). In those cases, the officers already had reasonable suspicion and conducted LEIN checks in furtherance of their initial stop. Here, the officers conducted the LEIN check without first having reasonable suspicion to make the detention.

those circumstances.[9] The critical distinction between this and a consensual encounter is that defendant was no longer being asked questions he could refuse to answer.

Moreover, an officer's subjective intent *is* relevant to the extent that it may have been conveyed to the defendant by the words or actions of the officer. *Mendenhall, supra* at 554 n 6. In the following testimony, Officer Spickard confirmed that defendant was not free to leave once he initiated the LEIN check:

> *Q.* [*Defense counsel*]: At the point that you approached Mr. Jenkins and asked him for his I.D., he was not free to leave at that point, correct?
>
> *A.* [*Officer Spickard*]: That would be correct.
>
> *Q.* And if he would have tried to run away, you would have run after him, correct?
>
> *A.* That would be correct.
>
> *Q.* And if he would have tried to run away, you would have stopped him?

---

[9] The majority enigmatically states that while I "conclude[] that no reasonable person would walk away under the circumstances, this view was obviously not shared by the defendant, who walked away 'under those circumstances.'" *Ante* at 3 n 2. Not only am I befuddled at what this lends to the majority's analysis, it seems to assume that I state that defendant was a reasonable person. I do not. Moreover, the test to determine when a person was seized does not consider the defendant's subjective feelings or actions; rather, it asks whether a reasonable person in defendant's position would feel free to leave. *Hodari D, supra* at 627-628.

9

*A.* That would be correct.

*Q.* And, in fact, as you testified on direct, you encouraged him throughout this whole encounter to stick around?

*A.* Correct.

*Q.* Because you wanted to see what the results were of the LEIN check?

*A.* Correct.

*Q.* And he was never free to leave throughout that entire encounter?

*A.* I would characterize that as correct.

*Q.* And he was never able to get his I.D. back from you, correct?

*A.* I believe we maintained possession of his identification, yes.

* * *

*Q.* And if he had asked you for the I.D. back at that point, you would have said no?

*A.* Pending the results of the LEIN check, yes.

Officer Spickard was an experienced officer with a ten-year history with the Ann Arbor Police Department. It is reasonable to presume that these officers, by their conduct and by withholding defendant's identification card, were effectively conveying to defendant that he was not free to leave.[10]

---

[10] The majority misreads my analysis by concluding that I find the officers' subjective beliefs, without more, material. But what I conclude is that the officers' show

The officers could have easily avoided offending the Fourth Amendment. They could have extended the exchange by asking defendant if he had any warrants, thereby giving defendant an opportunity to answer "yes" or "no" or refuse to answer altogether. They could have then asked him if he minded if they checked. Again, defendant could have answered or refused to answer. But despite the simplicity and legitimacy of this method, and the well-settled recognition that the police may approach people and ask noncoercive questions without needing constitutional justifications, today's majority contravenes well-settled constitutional law by installing a rule by which an officer can approach a person, ask for identification, and run a warrant check without reasonable suspicion that criminal activity is afoot merely because that person is in a high-crime area. Indeed, it cannot be clearer that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v Wardlow*, 528 US 119, 124;

---

of authority, actions, words, and conduct were objective manifestations of their clearly held subjective belief that defendant was not free to leave. Such a conclusion is perfectly within the confines of the rules governing the consideration of subjective beliefs. See *Mendenhall, supra* at 555 n 6.

11

120 S Ct 673; 145 L Ed 2d 570 (2000), citing *Brown v Texas*, 443 US 47; 99 S Ct 2637; 61 L Ed 2d 357 (1979).

Thus, like each court that has heard the matter until now, I would hold that defendant was illegally seized without reasonable suspicion or probable cause. The officers retained defendant's identification card and initiated a LEIN check without defendant's permission and after having already resolved their initial stated concern. The officers did not identify, nor do the facts show, any circumstances that suggested that the officers had a reasonable, articulable suspicion based on objective observations that defendant had been, was, or was about to engage in criminal wrongdoing at that point. *Shabaz*, *supra* at 59. Moreover, I believe that the officers' conduct and the circumstances surrounding the detention would have persuaded any reasonable person to conclude that he was not free to leave. As such, I would affirm the decision of the Court of Appeals.

Michael F. Cavanagh
Marilyn Kelly
